# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE ESTATE
OF STEPHANIE ANDERSON, deceased,

      Plaintiff,

vs.                              No. CIV 12-0605 JB/GBW

DENNY'S INC.,
BARRERAS ENTERPRISES, INC.,
FRANK H. BARRERAS, JUNE R. BARRERAS,
JUDITH A. BARRERAS,
JOSE HUMBERTO MELGAR-CABRERA,
MARVIN ANTONIO AGUILAR-LOPEZ
and PABLO DE LEON ORITZ,

      Defendants,

and

DENNY'S MANAGEMENT INC.,

      Cross Claimant,

vs.

FRANK H. BARRERAS, JUDITH A.
BARRERAS, JUNE R. BARRERAS,
and BARRERAS ENTERPRISES, INC.

      Cross Defendants.

## MEMORANDUM OPINION[1]

---

[1] On September 30, 2013, the Court entered an Order granting in part and denying in part the Motion for Summary Judgment of Denny's, Inc., filed October 26, 2012 (Doc. 40). See Order, filed September 30, 2013 (Doc. 86)("MSJ Order"). The Court also entered an Order denying the Motion to Continue Defendant Denny's Inc. Summary Judgement[sic] Hearing, filed January 29, 2013 (Doc. 60). See Order, filed September 30, 2013 (Doc. 87)("Motion to Continue Order"). The Court stated that it would "at a later date issue a memorandum opinion more fully detailing its rationale for this decision." MSJ Order at 2 n.1; Motion to Continue Order at 2 n.1.

**THIS MATTER** comes before the Court on: (i) the Motion for Summary Judgment of Denny's, Inc., filed October 26, 2012 (Doc. 40)("MSJ"); and (ii) the Motion to Continue Defendant Denny's Inc. Summary Judgement[sic] Hearing, filed January 29, 2013 (Doc. 60)("Motion to Continue").   The primary issues are: (i) whether Plaintiff Estate of Stephanie Anderson ("Anderson Estate") properly requested the Court to continue the MSJ hearing; and (ii) whether Defendant Denny's, Inc.[2] as the franchisor is vicariously liable for the failure of Defendant Barreras Enterprises, Inc., the franchisee, to provide a safe working environment.   The Court held hearings on February 8, 2013, and November 5, 2013.   The Court will deny the Motion to Continue and will deny the MSJ.   Counsel for the Anderson Estate did not follow proper procedure in requesting the Court to continue the hearing; however, the Court allowed the Anderson Estate to supplement with discovery on the MSJ.   The Court will deny the MSJ, because the facts do not establish as a matter of law that Denny's, Inc. is not involved in the day-to-day operations of the franchisee restaurant.

## FACTUAL BACKGROUND

On June 20, 2009, Stephanie Anderson was working at a Denny's restaurant located at 1602 Coors Boulevard, N.W. in Albuquerque, New Mexico.   See MSJ ¶ 1, at 2 (setting forth this fact); Response to Defendant Denny's Inc. Motion for Summary Judgment ¶ 1, at 1, filed January 10, 2013 (Doc. 55)("Response")(stipulating to this fact); Response of Plaintiff Estate of Stephanie Anderson to Defendant Denny's Inc. Motion for Summary Judgment ¶ 1, at 3 (Doc. 75)("Second

---

This Memorandum Opinion is the promised opinion.

[2] The Anderson Estate named "Denny's Management, Inc." in the caption of its case, but Denny's, Inc. refers to itself in its briefing as "Denny's Inc." or "Denny's, Inc."

Response")(stipulating to this fact).[3]  Three El Salvadoran nationals, Defendants Jose Humberto

Melgar-Cabrera, Marvin Antonio Aguilar-Lopez, and Pablo De Leon Ortiz, shot and killed

Anderson during an armed robbery at the restaurant.  See MSJ ¶¶ 1, 4, at 2, 3 (setting forth this

fact); Response ¶¶ 1, 4, at 1, 2 (stipulating to this fact); Second Response ¶¶ 1, 4, at 3, 4

(stipulating to this fact).  Anderson was acting in the scope and course of her employment as an

employee of Barreras Enterprises, a Denny's, Inc. franchisee, at the time of her death; she was not

a Denny's, Inc. employee.  See MSJ ¶ 22, at 6 (setting forth this fact); Response ¶ 22, at 4

(stipulating to this fact); Second Response ¶ 22, at 6 (stipulating to this fact).

### 1.    Defining the Franchisor and Franchisee Relationship.

On July 13, 1989, Denny's, Inc., or its predecessor in interest, entered into a Franchise

Agreement with Frank H. and June R. Barreras, the Barreras Enterprises' predecessor in interest,

to operate the Denny's Restaurant at 1602 Coors Boulevard in Albuquerque.  See Franchise

Agreement Greenfield [sic] at 5, filed October 26, 2012 (Doc 40-1 at 5)("Franchise Agreement");

MSJ ¶ 2, at 3 (setting forth this fact); Response ¶ 2, at 2 (stipulating to this fact); Second Response

¶ 2, at 3 (stipulating to this fact).[4]  On October 23, 1998, Denny's, Inc. or its predecessor in

---

[3] The Anderson Estate responded to Denny's, Inc.'s "undisputed facts" in the MSJ
identically both in the Response and in the Second Response.  The Court notes both responses,
because the Anderson Estate had an opportunity to conduct discovery between the two responses,
and the Second Response should have addressed any argument in the Response that the Anderson
Estate needed more discovery.  The Second Response also lists separate facts, and so the Court
includes references to both the Response and Second Response where applicable.

[4] The Anderson Estate did not specifically controvert the Franchise Agreement's
authenticity in responding to the MSJ's undisputed facts.  It questioned the Franchise
Agreement's authenticity within its Response and at hearings.  Although the Anderson Estate
alleges that the Franchise Agreement attached to the MSJ differs from the Franchise Agreement
from Denny's, Inc.'s initial disclosures, see Transcript of Hearing 28:1-14, 28:22-29:9, taken
February 8, 2013 ("Feb. Tr.")(the Court's citations to the transcript of the hearing refer to the court
reporter's original, unedited version.  Any final transcript may contain slightly different page

interest entered into a "Consent to Assignment of Franchise Agreement,"  which assigned all

rights and obligations under the 1989 Agreement from Defendants Frank H. Barreras and June R.

Barreras to Barreras Enterprises.   See Franchise Agreement at 38; MSJ ¶ 3, at 3 (setting forth this

fact); Response ¶ 3, at 2 (not controverting this fact); Second Response ¶ 3, at 3 (not controverting

this fact).[5]   The Franchise Agreement was in full force and effect on June 20, 2009, when

---

and/or line numbers); the Anderson Estate has not submitted the first discovered Franchise
Agreement to the Court.   There is no evidence before the Court controverting the authenticity of
the Franchise Agreement that Denny's, Inc. attached to the MSJ, and although the Court has
questions about typographical errors, inconsistent typeface, and appearance of the pages, that
unprofessionalism does not raise an issue of authenticity on its own.

   [5] Although the Anderson Estate says that it disputes this fact and requests discovery to
determine if Denny's, Inc. charged a franchise fee or properly investigated Barreras Enterprises,
see Response ¶ 3, at 2; Second Response ¶ 3, at 3, the Anderson Estate has conducted discovery
and did not submit any evidence to controvert this fact.   Local Rule 56.1(b) of the United States
District Court for the District of New Mexico provides in part:

> The Response must contain a concise statement of the material facts cited by the
> movant as to which the non-movant contends a genuine issue does exist.   Each fact
> in dispute must be numbered, must refer with particularity to those portions of the
> record upon which the non-movant relies, and must state the number of the
> movant's fact that is disputed.   All material facts set forth in the Memorandum will
> be deemed undisputed unless specifically controverted.   The Response may set
> forth additional facts other than those which respond to the Memorandum which
> the non-movant contends are material to the resolution of the motion.   Each
> additional fact must be lettered and must refer with particularity to those portions of
> the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b).   The local rules regarding summary judgment thus require the
responding party to "specifically controvert[]" the fact or else the fact is deemed admitted.
N.M.LR-Civ. 56.1(b).
   Denny's, Inc. notes that the Anderson Estate, in requesting further discovery, did not attach
a rule 56(d) affidavit pursuant to the Federal Rules of Civil Procedure.   See Reply of Defendant
Denny's, Inc., in Support of Motion for Summary Judgment ¶ 3, at 2-3, filed January 28, 2013
(Doc. 59)("Reply").   Further, Denny's, Inc. argues that "[i]t is immaterial to a determination of
this Motion whether or not the 'franchisee assignment fee' was charged, whether Denny's
properly investigated Barreras Enterprises, or whether the assigned entity was a viable and legally
formed corporation."   Reply ¶ 3, at 3.

Anderson was shot and killed.  See Affidavit of Arthur "Arp Boudaki.a. [sic] ¶ 6, at 2, filed October 26, 2012 (Doc. 40-1 at 1)("Boudakian Aff.");[6] MSJ ¶ 4, at 3 (setting forth this fact); Response ¶ 4, at 2 (stipulating to this fact); Second Response ¶ 4, at 3 (stipulating to this fact).

Under the Franchise Agreement, the parties agreed:

> It is expressly understood and agreed by the parties that Franchisee is [n]ot for any purpose an employee or agent of [Denny's], is not for any purpose an employee or agent of [Denny's], and that all of the personnel employed by Franchisee at the Restaurant will be empl[o]yees or agents of the Franchisee as an independent contractor and will not be employees or agents of [Denny's].  Franchisee understands and agrees that, as an independent contractor, [i]t does not have the authority to do anything for or on behalf of the Company, including, but not limited to, holding itself [o]ut as the Company, signing contracts, notes or other [i]nstruments, acquiring or disposing of any property, or making purchases or [i]ncurring any other obligation or liability.

Franchise Agreement § 1.3, at 6; MSJ ¶ 7, at 3-4 (setting forth this fact); Response ¶ 7, at 2 (stipulating to this fact).[7]  Denny's, Inc. and Barreras Enterprises are "completely separate companies."  Boudakian Aff. ¶ 8, at 2; MSJ ¶ 17, at 5 (setting forth this fact); Response ¶ 17, at 4 (stipulating to this fact).  The Franchise Agreement states:

> Franchisee agrees that in all public records, [i]n its relationship with other persons or companies, and [i]n any offering circu[l]ar, prospectus or similar document, Franchisee [s]hall indicate clearly the independent ownership of the Franchisee's

---

Even after the Anderson Estate had an opportunity to conduct discovery, it did not submit evidence to controvert this fact; it is thus undisputed.

[6] Arthur Boudakian is the Regional Director of Franchise Operations for Denny's, Inc. See Boudakian Aff. ¶ 1, at 1.

[7] The Anderson Estate stipulates that the Franchise Agreement identifies the franchisee as an independent contractor, but argues that Denny's, Inc. has control over the franchisee based on the Operations Manual and training curriculum and implementing the Denny's System.  See Response ¶ 7, at 2; Second Response ¶ 7, at 4.  The Anderson Estate has not, however, attached any evidence from the Operations Manual or training curriculum to dispute what the parties agreed among themselves.  Thus, as to what Denny's, Inc. and Barreras Enterprises agreed among themselves, the fact is undisputed.

business and that the operations of said business are separate and distinct from the operation of [Denny's] business.

Franchise Agreement § 2.4, at 7; MSJ ¶ 8, at 4 (setting forth this fact); Response ¶ 8, at 3 (stipulating to this fact).   Denny's, Inc. does not own the building, real property, or the restaurant located at 1602 Coors Boulevard in Albuquerque.   See Boudakian Aff. ¶ 5, at 2; MSJ ¶ 9, at 4 (setting forth this fact); Response ¶ 9, at 3 (stipulating to this fact).

In exchange for allowing Barreras Enterprises the right to operate a restaurant using the Denny's, Inc.'s Marks, Barreras Enterprises must pay a franchise fee and other consideration, see Franchise Agreement § 6, at 11-12; MSJ ¶ 12, at 5 (setting forth this fact); Response ¶ 12, at 3 (stipulating to this fact), including four percent of weekly gross sales in exchange for using Denny's, Inc.'s Marks and other company-provided supervision and training, and two percent of weekly gross sales for institutional advertising, public relations, and promotion, see Franchise Agreement §§ 6.1.b. and 6.1.c, at 11.   The Franchise Agreement requires Barreras Enterprises to send Denny's, Inc. a cumulative cash register tape to show the weekly sales.   See Franchise Agreement § 7.3, at 12; Response ¶ 16, at 3-4 (setting forth this fact); Reply at 3 (not disputing this fact).   For purposes of the Barreras Enterprises' obligations of royalty payments under the Franchise Agreement, Denny's, Inc. tracks sales, but does not control Barreras Enterprises' net cash deposits.   See Boudakian Depo. at 28-29; Second Reply ¶ 26, at 9 (setting forth this fact).[8] Denny's, Inc. assists Barreras Enterprises market its restaurant, in part because of its financial interest in Barreras Enterprises' success, through royalties based on sales.   Boudakian Depo. at

---

[8] Denny's, Inc. set forth additional facts in its Second Reply, and the Anderson Estate did not respond, either in writing or at the oral arguments, to dispute those facts.   Because there is no evidence to dispute these additional facts from the Second Reply, the Court finds these additional facts undisputed.

149-50; Second Reply ¶ 38, at 12 (setting forth this fact).

## 2.   The "Denny's System" and "Denny's Marks".

The Franchise Agreement states Denny's, Inc. has a unique and particular plan for the operation of family style restaurants.   See Franchise Agreement at § 1.4, at 5; MSJ ¶ 5, at 3 (setting forth this fact); Response ¶ 5, at 2 (stipulating to this fact).[9]   The Franchise Agreement describes the "Denny's Marks" and the "Denny's System":

> The Company owns the trademark, service mark and trade name "Denny' s" [sic] and other related trademarks, service marks, trade names, copyrights, labels, designs, symbols, and distinctive logotypes (the "Denny's Marks") and the Company has a unique [a]nd particular plan for the operation of family style restaurants, including, but not limited to the Denny's Marks, the Operations Manual, policies, standards, procedures, em[p]loyee uniforms, signs, menus, and related [i]tems, and the reputation and goodwill of the company'[s] chain of restaurants (the "Denny's System").   The Company desires to have the Restaurant operated as a Denny's restaurant utilizing the Denny's System and the Denny's Marks.   Franchisee understands and agrees that strict adherence to these standards, policies, procedures and requirements is essential to the value of the Denny's Sy[s]tem and the Denny's Marks[.]

Franchise Agreement § 1.4, at 5.[10]   Barreras Enterprises must strictly adhere to all standards, policies, procedures, and requirements for the operation, maintenance or improvement of Denny's, Inc.'s restaurants using the Denny's System and the Denny's Marks.   See Franchise Agreement § 6, at 3; MSJ ¶ 6, at 3 (setting forth this fact); Response ¶ 6, at 2 (stipulating to this fact).[11]

_____

[9] The Anderson Estate adds that "the plan for the Denny's System includes standards of operation that are monitored, inspected and adjusted throughout the term of the Agreement by Denny's Inc."   Response ¶ 5, at 2.

[10] Although neither party sets forth this provision from the Franchise Agreement in its entirety, the parties reference this provision, and the provision is in the Franchise Agreement, which is part of the record before the Court.

[11] The Anderson Estate also states in its initial Response that "the Operations Manual includes updates and new developments and memoranda, bulletins and other procedural standards that are mandated and controlled by Denny's Inc. and should be produced in discovery."

To protect its brand and marks, Denny's, Inc. controls various aspects restaurant site development, including construction and remodeling, which must be done at Barreras Enterprises' sole expense.  See Franchise Agreement § 5, at 8-11; MSJ ¶ 10, at 4 (setting forth this fact); Response ¶ 10, at 3 (not disputing this fact).   Denny's, Inc. has the right to "enter the premises to make any [m]odifications necessary to protect the Denny's Marks and related proprietary rights," among other things.   Franchise Agreement § 4.3.E, at 8; MSJ ¶ 11, at 4 (setting forth this fact); Response ¶ 11, at 3 (stipulating to this fact).   The Franchise Agreement also sets forth detailed provisions requiring Barreras Enterprises to comply with Denny's, Inc.'s operations manual, food service standards, restaurant maintenance and repair, hours of operation, personnel standards, inspections, and training.   See Franchise Agreement §§ 11-16; MSJ ¶ 14, at 5 (setting forth this fact); Response ¶ 14, at 3 (stipulating to this fact).

Arthur Boudakian, the regional director of franchise operations for Denny's, Inc., is responsible for oversight and operations of certain franchisees.   Boudakian Aff. ¶ 1, at 1. Denny's, Inc.'s oversight and training of franchisees and their employees is necessary "to ensure brand integrity and a uniform application of the Denny's system."   Boudakian Aff. ¶¶ 1-2, at 1. See MSJ ¶ 15, at 5 (setting forth this fact); Response ¶ 15, at 3 (stipulating to this fact).   The Denny's, Inc.'s brand is "the service standards, the food quality, the timing standards, making sure that we're providing across the United States an experience to the guests that's as consistent as -- as possible."   Boudakian Depo at 35:20-24.   See Second Response at 11 (setting forth this fact); Second Reply ¶ 29, at 10 (setting forth this fact).   Denny's Marks are "[o]ur signs, our menus, our

Response ¶ 6, at 2.  Although the Anderson Estate has conducted more discovery since filing its initial Response, it has not attached the Operations Manual as additional evidence for the Court to consider.

service standards, our -- we have a number of menu items that are specifically, you know, copywrited, our Denny's Marks: Grand Slam Breakfast, Grand Slam Slugger, Moon's over my Hammy."  Boudakian Depo. at 35:12-16.   See Second Reply ¶ 28, at 10 (setting forth this fact). The Denny's, Inc. System is "a system in regards to food handling, in regards to menu items, in regards to recipes, in regards to what we offer the guests in terms of, you know, service standards and timing standards in protecting our Marks and that's -- that's the system, in my opinion." Boudakian Depo. at 121:20-25.   See Second Reply ¶ 34, at 11 (setting forth this fact).   The Core Values Workshop, designed to teach a Denny's System which is uniform, is "[h]ow our guests are treated, the service they receive, the food they receive is very important to us, so we do anything we can to help make sure we're consistent across the country."   Boudakian Depo. at 120:22-25. See Second Response at 16 (setting forth this fact); Second Reply ¶ 33, at 11 (setting forth this fact).   The Denny's, Inc. philosophy concerning the Franchise Agreement requirements with respect to various services, quality control and other standards is that it is important to have a "consistent environment across the United States" without which the Denny's brand could be "hurt."   Boudakian Depo. at 147-149; Second Reply ¶ 37, at 11 (setting forth this fact).

> **4.**     **Denny's, Inc's Requirements for Training and Inspections.**

Barreras Enterprises and its managers must attend training to learn the Denny's System. See Franchise Agreement § 16, at 22-24; Response at 6-7 (setting forth this fact); Reply ¶ C, at 6 (not disputing this fact).   Denny's, Inc. does not allow Barreras Enterprises' restaurant to open until it is satisfied that Barreras Enterprises and its managers have been adequately trained.   See Franchise Agreement § 16.1.c, at 23; Response at 6-7 (setting forth this fact); Second Reply ¶ C.2., at 4 (setting forth this fact).   As new developments in the Denny's System occur, Denny's, Inc. may require Barreras Enterprises and its personnel to attend refresher or additional training, at

Barreras Enterprises' expense.   <u>See</u> Franchise Agreement § 16.2, at 19; Second Response at 7-8 (setting forth this fact); Second Reply ¶ C.3, at 5 (admitting this fact).   Denny's, Inc. also may offer optional training programs and seminars for Barreras Enterprises, and Barreras Enterprises' managers or other personnel.   <u>See</u> Franchise Agreement § 16.3, at 19; Response at 7 (setting forth this fact); Second Response at 8 (setting forth this fact); Reply ¶ C, at 6 (not disputing this fact); Second Reply ¶ C.3 (admitting this fact).

Denny's, Inc. inspects Barreras Enterprises for quality control, hazard analysis and other matters through its "HACCP"[12] inspections, a hospitality, quality enhancement review on all restaurants, "[t]o make sure that we protect our brand and our mark, to make sure that we're offering the products that we should offer, we have the service that we should offer, that the restaurant is clean and that we're following health department regulations."   Boudakian Depo. at 31:18-24, 32:14-18.   <u>See</u> Second Response at 11 (setting forth this fact); Second Reply ¶ 27, at 10 (setting forth this fact).   Denny's, Inc. conducts this inspection on all Denny's, Inc.'s restaurants, both franchisee-owned and company-owned.   <u>See</u> Boudakian Depo. at 31; Second Reply ¶ 27, at 10 (setting forth this fact).   The review's purpose is "to make sure that we protect our brand and our mark and make sure that we're offering the products we should offer and the service that we should offer, that the restaurant is clean and that we're following health department regulations." Boudakian Depo. at 32-24.   <u>See</u> Second Reply ¶ 27, at 10 (setting forth this fact).   For example, Denny's, Inc. requires employees to wash their hands before putting on a new pair of gloves. Boudakian Depo. at 57:9-23; Second Response at 12 (setting forth this fact); Second Reply at 6-7 (not disputing this fact).   On the Hospitality, Quality & HACCP Review form, Denny's, Inc.

---

[12] HACCP stands for Hazard Analysis and Critical Control Points.   <u>See</u> Boudakian Depo. at 30:20.

reviews Barreras Enterprises' service standards, including standards such as: "Immediate friendly greeting," "Seating according to standards," "Silverware rolled and delivered with menu or table is preset," "Friendly server introduction," "Beverage order taken," "Items suggestively sold," "Plate presentation," "Pre-bussing of tables," "Timely cash out, food, service, or dining experience inquiry made," "Tables-clean and reset promptly," "Guests made to feel welcomed when entering our restaurant," "Managers/employees have sense of urgency," "Guests thanked when leaving," "guests invited to return to Denny's," "Dumpster/Grease containers - clean/lids closed/good repair," "Exterior lighting-functioning/good repair," "Exterior lighting-functioning/good repair," "Cleanliness/temperature is set for guest comfort," "Carpet/floor/baseboards-clean/good repair," "Ice bins/cover-clean/scoop used and stored properly/lid closed when not in use," "Salad refrigerators/gaskets-clean/good repair (40º F or below)," and "Pots/pans/inserts/shelves/racks used to hold, store equipment or utensils-clean/good repair.".   Hospitality, Quality & HACCP Review at 2, filed May 14, 2013 (Doc. 75-2).   See Second Response ¶ 3, at 21 (setting forth the fact by referring to the evaluation form); Second Reply ¶ 3, at 8 (admitting the evidence's authenticity).   "[F]ollowing food safety laws is something we're concerned about," without which it could "be detrimental to the brand."   Boudakian Depo. at 90-91.   See Second Reply ¶ 31, at 10-11 (setting forth this fact).   Further, "creating a clean environment is part of what we need to do to protect our brand and our marks and make sure that we provide a consistent environment for our guests."   Boudakian Depo. at 98-99.   See Second Reply ¶ 31, at 10-11 (setting forth this fact).   "[A]ll of the food handling, absolutely is covered in our training so that we protect our brand, make sure we're consistent, we offer the same recipes and same food across the United States . . . ."   Boudakian Depo. at 107-108.   See Second Reply ¶ 32, at 11(setting

- 11 -

forth this fact).   Boudakian inspects, as the regional director of franchise operations, several

different aspects of the restaurants:

> We make sure that they are providing the food that they should provide; that they
> buy it from the right place they need to buy it, approved vendors; that the recipes
> are being used; that the service standards are being followed in the restaurants; we
> make sure that they use the Denny's signs correctly, and that they follow -- let's
> see, what else, there's prep and pull for food -- for food product that we look at; the
> cleanliness of the restaurant we look at.   Those are the things we look at.

Boudakian Depo. at 18:-19.   See Second Reply ¶ 23, at 9 (setting forth this fact).

The Franchise Agreement states that Denny's, Inc. has the option to terminate the

agreement if: (i) Barreras Enterprises fails, within ten days after notification of non-compliance, to

comply with any federal, state, or local law applicable to the operation and maintenance of the

restaurant, including but not limited to, public health and safety requirements; (ii) Denny's, Inc.

reasonably determines that Barreras Enterprises' continued operation of the restaurant will result

in an imminent danger to public health or safety; or (iii) Barreras Enterprises fails after having

received a reasonable opportunity, no more than thirty days, to correct a deficiency or

unsatisfactory condition referenced in an inspection report.   See Franchise Agreement § 12.1, at

19-20; Response at 6 (setting forth this fact); Reply ¶ B, at 5 (not disputing this fact); Second

Response at 9 (setting forth this fact); Second Reply ¶ C.8 (not disputing this fact).   Denny's,

Inc.'s right under the Franchise Agreement to terminate a franchise through a "default process"

include "[n]ot paying their royalties, not remodeling when they're dated to remodel.   If they

have . . . repeated issues with . . . health departments or any government agencies."   Boudakian

Depo. at 59:2-5.   See Second Reply ¶ 30 (setting forth this fact).

If Denny's, Inc. terminates the agreement, whether Barreras Enterprises agrees or defaults

or otherwise, Denny's, Inc. reserves the right, at its option, to

elect to purchase the franchisee's interest in the leasehold in the leasehold improvements and furniture, fixtures, equipment, and any or all of the other tangible restaurant assets at purchase price equal to the lesser of franchisee's costs or the fair market value of such leasehold improvements, furniture, fixtures, equipment and other assets, and to purchase franchisee's inventory at franchisee's cost thereof.

Franchise Agreement § 19.1.d.  See Response at 6 (setting forth this fact); Reply ¶ B, at 6 (not disputing this fact); Second Reply at ¶ B.1, at 3-4 (setting forth this fact).

5.     **Required Insurance.**

The Franchise Agreement requires Barreras Enterprises to obtain various forms of comprehensive general liability insurance.  See Franchise Agreement § 9, at 16-17; MSJ ¶ 13, at 5 (setting forth this fact); Response ¶ 13, at 3 (stipulating to this fact).  Denny's, Inc. requires Barreras Enterprises to obtain and maintain insurance of at least one million dollars, combined single limit; to name Denny's, Inc. as an additional insured on such policies; and to defend, indemnify, and hold harmless Denny's, Inc. against any and all loss, costs, "expenses (including attorney's fees), damages and liabilities, however caused, resulting directly or indirectly from or pertaining to the use, condition,  . . . or operation of the Restaurant . . . ."  Franchise Agreement §§ 9.1, 9.3, at 16, 17.  See Response at 7 (partially setting forth this fact); Second Response at 8 (partially setting forth this fact); Reply ¶ D, at 6 (not disputing this fact) Second Reply ¶ C.5, at 5 (partially setting forth this fact).

6.     **Employee Oversight.**

The Franchise Agreement requires Barreras Enterprises to ensure that the employees are neat, clean, and adequately trained and supervised; that they wear neat, clean, and uniform attire; and that they serve the public in a courteous, efficient, and skilled manner, all in accordance with the Operations Manual.  See Franchise Agreement §§ 14.1-14.2, at 20-21; Response at 8 (setting

forth this fact); Second Response at 9 (setting forth this fact); Reply ¶ F, at 6 (not disputing this fact); Second Reply ¶ C.9 (not disputing this fact).

> It is mutually understood and agreed by the parties that Franchisee retains the responsibility and independent authority, notwithstanding any provision of this Agreement, to maintain and enforce personnel policies and procedures, [i]ncluding, but not limited to, hiring, firing and disciplining [i]ts employees.  Nothing contained in this Agreement shall be construed or interpreted [so] that any employee of Franchisee becomes or is deemed to be an employee or agent of the Company.  Franchisee shall be solely responsible for the maintenance and handling of all employee[] matters . . . .

Franchise Agreement § 14.5, at 21.  Denny's, Inc. does not hire or fire Barreras Enterprises' employees.  See Boudakian Aff. ¶¶9-10, at 3; MSJ ¶ 18, at 6 (setting forth this fact); Response ¶ 18, at 4 (not controverting this fact).  Denny's, Inc. is "not involved in hiring, firing or counseling employees or managers.  We're not involved in what wages they pay employees."  Boudakian Depo. at 150-51.  See Second Reply ¶ 39 (setting forth this fact).  Further, Denny's, Inc. is not involved in Barreras Enterprises' employee handbooks, what benefits are offered, whether discounts are given for employee meals, health insurance, or bonuses.  See Boudakian Depo. at 150-51; Second Reply ¶ 39 (setting forth this fact).   Barreras Enterprises obtains its own liability insurance and is responsible for its own liabilities, such as discrimination cases.  See Boudakian Depo. at 152-53; Second Reply ¶ 39 (setting forth this fact).  Barreras Enterprises is responsible for its own building maintenance, building utilities, and taxes.  See Boudakian Depo. at 152-54; Second Reply ¶ 39 (setting forth this fact).

     **7.     Hours of Operation.**

The Franchise Agreement requires Barreras Enterprises' restaurant to operate twenty-four hours a day and seven days a week.  See Franchise Agreement § 13.1, at 20; Response at 7 (setting forth this fact); Second Response at 8 (setting forth this fact); Second Response ¶ 1, at 20

(setting forth this fact); Reply ¶ E, at 6 (not disputing this fact); Second Reply ¶ C.6, at 5 (admitting this fact); Second Reply ¶ 1 at 7 (admitting this fact).   "If the franchisee, or if it's a company restaurant, feels that it's a danger to the employees or the guests, they can go through a process . . . at which our assets protection folks determine whether the restaurant can close or not close."  Boudakian Depo. at 21:14-19.   See Second Response at 9 (setting forth this fact); Second Reply ¶ D.1, at 7 (setting forth this fact).   Before changing the operating-hours requirement, Barreras Enterprises must produce evidence of 911 calls, incidents when police were involved, and what Barreras Enterprises did to solve the problem without closing, such as adding extra managers, extra employees, or security.   See Boudakian Aff. at 21:14-23:15; Second Response at 9-10 (setting forth this fact); Second Reply at 6-7 (not disputing this fact).

**8.      Security.**

Denny's, Inc. provides security for its corporate-owned restaurants.   See Boudakian Depo. at 27; Second Response ¶ 2, at 20 (setting forth this fact); Second Reply ¶ D.2, at 7 (not disputing this fact).   Corporate-owned restaurants are separate and apart from franchisee-owned restaurants.   See Boudakian Depo. at 27; Second Reply ¶ 25 (setting forth this fact).   For corporate-owned restaurants, Denny's, Inc. trains the managers on security issues related to cash, such as "cash control" and "how to go to the bank."   Boudakian Depo. at 106:16-21.   See Second Response at 14 (setting forth this fact); Second Reply at 6-7 (not disputing this fact).   Denny's, Inc. has policies for hiring security guards at corporate-owned restaurants, but does not get involved in Barreras Enterprises' security.   See Boudakian Depo. at 135:11-14, 137:1-3; Second Response at 17-18 (setting forth this fact); Second Reply at 6-7 (not disputing this fact).   Regarding security measures, Denny's, Inc. may hire security guards only in corporate-owned stores, not franchisee-owned stores.   Boudakian Depo. at 133-137; Second Reply ¶ 35 (setting

forth this fact).

Denny's, Inc. does not have the right to control decisions regarding security at Barreras Enterprises' restaurant, such as employing security guards, security warning or alarm systems, or security cameras.   See Boudakian Aff. ¶ 11, at 3; MSJ ¶ 19, at 6 (setting forth this fact); Response ¶ 19, at 4 (not controverting this fact).[13]   Barreras Enterprises, not Denny's, Inc., has the sole discretion to provide security, the nature of that security, its cost, and any other issue involving measures to prevent criminal activity on or about the franchisee's premises.   See Boudakian Aff. ¶ 12, at 3; MSJ ¶ 20, at 6 (setting forth this fact); Response ¶ 20, at 4 (not controverting this fact). Denny's, Inc. is not involved in Barreras Enterprises' security, because Barreras Enterprises' employees

> don't work for [Denny's, Inc.].   They're an independent operator and they can --
> other than protecting the marks and the brands and the food and the service . . . they
> can have security or not have security.   That's up to them.   We don't get
> involved . . . because their employees work for the franchise not the corporation.
> So the franchisee does . . . what they want to protect their employees.

Boudakian Depo. at 23:8-24:9; Second Response at 10 (setting forth this fact); Second Reply ¶ 24, at 9 (setting forth this fact).

Denny's, Inc. does not receive information from franchisees when owners, operators, or employees are victims of crime because "they do not work for us."   Boudakian Depo. at 29:16-19; Second Response at 11 (setting forth this fact).   Denny's, Inc. did not know of any criminal activity in or around the 1602 Coors Boulevard Denny's restaurant before June 20, 2009.   See Boudakian Aff. ¶¶ 14-15, at 4; MSJ ¶ 21, at 6 (setting forth this fact); Response ¶ 21, at 4 (not

---

[13] The Anderson Estate denied this fact, because the fact cited by Denny's, Inc. was not in the Franchise Agreement.   See Response ¶ 19, at 4.   Denny's, Inc. corrected this mistake and clarified that the reference should have been to the Boudakian Affidavit, rather than to the Franchise Agreement.   See Reply ¶ 18, at 3.   The Anderson Estate has not produced any evidence to controvert this fact, and thus this fact will be deemed admitted.

controverting this fact).  Denny's, Inc. was not aware of any series of armed robberies taking place at Denny's franchised restaurants in Albuquerque before Anderson's death.  See Boudakian Depo. at 139-142; Second Reply ¶ 36 (setting forth this fact).

## PROCEDURAL BACKGROUND

The Anderson Estate is bringing a suit for wrongful death against Denny's, Inc., Barreras Enterprises, F. Barreras, J.R. Barreras, and J.A. Barreras (collectively, "Barreras"), alleging that their "intentional act or omission proximately caused Stephanie Anderson's death."  Amended Complaint ¶ 34, at 6.  The Anderson Estate argues that Denny's, Inc. and the Barreras caused Anderson's death, through failing to properly train personnel on emergency procedures, failing to implement adequate security measures, failing to exercise due care in respect to Anderson, and willfully ignoring the foreseeability of the crime which took place on June 20, 2009.  See Amended Complaint ¶¶ 28-31, at 5-6.

1.      **Motion for Summary Judgment.**

Denny's, Inc. filed its MSJ on October 26, 2012, arguing that it does not owe a duty to Barreras Enterprises or to Barreras Enterprises' employees "to safeguard the work premises from the criminal acts of third parties," and that the Court should thus dismiss the Anderson Estate's claims against Denny's, Inc.   MSJ at 2.

Denny's, Inc. frames the issue as "whether the franchisor should be held vicariously liable for any negligence committed by the franchisee in failing to provide appropriate security measures, which results in personal injury or death to business invitees or employees."   MSJ at 7.  According to Denny's, Inc., the clear majority rule, and the rule in New Mexico, is that the "franchisor is not subject to vicarious liability for such claims."   MSJ at 7-8.  It provides the legal backdrop for vicarious liability, identifying itself as the principal and Barreras Enterprises as the

agent, but says that the Court may impose liability only if it finds that Denny's, Inc. had the right of control over Barreras Enterprises, making Barreras Enterprises its "servant."   MSJ at 8. Denny's, Inc. argues that, under New Mexico law, unless there is a special relationship between itself and Anderson, it did not have a duty to protect her from harm that the third parties' criminal acts caused.   MSJ at 8 (citing Rummel v. Edgemont Realty Partners, Ltd., 1993-NMCA-085, 116 N.M. 23, 26, 859 P.2d 491, 494).   Whether that special relationship exists depends on "the degree to which Denny's controls the operations of the restaurant owned by Barreras," specifically the control over day-to-day operations.   MSJ at 9.

Denny's, Inc. cites Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062, 122 N.M. 537, 928 P.2d 263, as the leading case in New Mexico for franchisor vicarious liability to franchisee employees and business invitees for third parties' criminal acts.   See MSJ at 9.   In that case, a third party shot and injured a gas station attendant and a customer at a Chevron gas station during the course of an armed robbery.   See MSJ at 9.   The Supreme Court of New Mexico affirmed the trial court's decision to grant Chevron U.S.A, Inc.'s motion for summary judgment, because it franchisor "did not have the necessary control or right of control governing the gas station's operations to create a duty," MSJ at 9, even though the plaintiffs demonstrated that Chevron U.S.A.: (i) sent inspectors to the gas station twice a year to inspect, among other things, the gasoline and oil products, (ii) provided a toll-free number for customers to voice concerns regarding the station's operations, and (iii) prohibited the station from selling or providing pornographic material, see MSJ at 10.   The Supreme Court of New Mexico said those activities did not provide Chevron U.S.A. sufficient control over the station to create a jury question on the right of control, because Chevron U.S.A. was simply protecting its trademark.   See MSJ at 10. Dennys, Inc. argues that this represents the majority rule, in which a "franchisor's 'control' to

- 18 -

ensure the franchisee upholds the quality and operations standards of the brand or marks does not alone establish a franchisor's vicarious liability for injuries to invitees or employees of the franchisee . . . ."   MSJ at 11.   Citing a case with facts that it says are similar to the current case, Denny's, Inc. argues that, when a franchisor requires the franchisee to remain open twenty-four hours a day and makes recommendations for security, rather than mandatory requirements, the franchisor is not exposed to vicarious liability for the franchisee's negligence resulting in death or injury to employees or invitees.   See MSJ at 12 (citing Wendy Hone Wu v. Dunkin Donuts, Inc., 105 F. Supp. 2d 83 (E.D.N.Y. 2000)).   Denny's, Inc. explains that these cases are in contrast to a small minority of courts that have held franchisors vicariously liable for a franchisee's negligence. See MSJ at 13.

Denny's, Inc. argues that the franchise agreement with Barreras Enterprises allows Denny's, Inc. to protect its brand and marks, but the agreement does not give Denny's, Inc. control over the restaurant's day-to-day operations or security.   See MSJ at 14.   Those decisions, in its view, "are solely within the authority and control of Barreras."   MSJ at 14.   Denny's, Inc. acknowledges that it has the ability to review the criminal activity history if a franchisee requests a waiver of the twenty-four-hour operating requirement, but it says that Barreras Enterprises did not make such a request and that it was not aware of criminal activity at the restaurant before Anderson's death.   See MSJ at 14-15.   Denny's, Inc. attached the Boudakian Affidavit and Franchise Agreement to the MSJ.

As of November 26, 2012, the Anderson Estate had not responded to the MSJ.   See Notice of Completion of Briefing at 1, filed November 26, 2012 (Doc. 43).   Instead, the Anderson Estate moved the Court to strike the Notice of Completion of Briefing.   See Motion to Strike Notice of Completion of Briefing on Summary Judgment filed by Denny's Inc., filed November 27, 2012

(Doc. 44)("Motion to Strike").   The Court indicated at a hearing on January 7, 2013, and then formalized its ruling in a Memorandum Opinion and Order, filed February 7, 2013 (Doc. 65)("Motion to Strike MOO"), that it would not strike the Notice of Completion of Briefing, but it would construe the Motion to Strike as a request for extension of time to respond to the MSJ.   See Clerk's Minutes at 1-2, filed January 7, 2013 (Doc. 63); Motion to Strike MOO at 1-2.   The Court noted that it was "bound to adjudicate motions for summary judgment on their merits . . . ." Motion to Strike MOO at 2.

On January 10, 2013, the Anderson Estate filed its initial response to the MSJ.   See Response.   The initial Response points out that the Franchise Agreement that Denny's, Inc. attached to its MSJ has numerous typographical mistakes and errors, uses different typefaces throughout the document, and inconsistently shows a two-hole punch photocopied onto some copied pages but not others.   See Response at 4-5.   The Anderson Estate argues that "[i]t appears on examination that provisions and pages in the Franchise Agreement were changed or modified after execution."   Response at 5.

Turning to the substance of the Franchise Agreement, the Anderson Estate argues that the agreement gives Denny's, Inc. "extensive control . . . over the day-to-day operations of a Denny's restaurant."   MSJ at 5.   For example, "[t]he Franchise Agreement is elaborate concerning the procedures to be followed to implement 'The Denny's System.'"   Response at 5.

> The Company owns the trademark, service mark and trade name "Denny' s" [sic]
> and other related trademarks, service marks, trade names, copyrights, labels,
> designs, symbols, and distinctive logotypes (the "Denny's Marks") and the
> Company has a unique end [sic] particular plan for the operation of family style
> restaurants, including, but not limited to the Denny's Marks, the Operations
> Manual, policies, standards, procedures, emPloyee [sic] uniforms, signs, menus,
> and related Items [sic], and the reputation and goodwill of the company'3 [sic]
> chain of restaurants (the "Denny's System").   The Company desires to have the
> Restaurant operated as a Denny's restaurant utilizing the Denny's System and the

Denny's Marks.

Franchise Agreement ¶ 1.4, at 5.   The Anderson Estate points to other provisions in the Franchise

Agreement to demonstrate the "control" Denny's, Inc. has over Barreras Enterprises: (i) Denny's,

Inc. may terminate the agreement if Barreras Enterprises fails to comply with the agreement's

standards and requirements, <u>see</u> Response at 6 (citing Franchise Agreement § 18.2, at 28-29[14]); (ii)

Denny's, Inc. can purchase the franchisee's restaurant after terminating the agreement, <u>see</u>

Response at 6 (citing Franchise Agreement § 19, at 29-30); (iii) Barreras Enterprises and its

managers must attend training to learn the Denny's System, <u>see</u> Response at 6-7 (citing Franchise

Agreement § 16, at 22-24); (iv) Barreras Enterprises and its managers or other personnel may

attend optional training programs, <u>see</u> Response at 7 (citing Franchise Agreement § 16.3, at

23-24); (v) Barreras Enterprises must provide Denny's, Inc. with full general liability insurance

coverage, and must hold Denny's, Inc. "harmless for claims by any employee concerning training"

that Denny's, Inc. provided, Response at 7 (citing Franchise Agreement § 9.0, at 16-17); (vi) the

restaurant must be open twenty-four hours a day and seven days a week, <u>see</u> Response at 7 (citing

Franchise Agreement § 13.1, at 20); (vii) the Franchise Agreement requires the employees to

provide service to the public in a courteous, efficient, and skilled manner, <u>see</u> Response at 8 (citing

Franchise Agreement § 14.2, at 21); and (viii) Denny's, Inc. can inspect Barreras Enterprises'

restaurant, <u>see</u> Response at 8 (citing Franchise Agreement § 12, at 19-20).

The Anderson Estate draws several distinctions between this case and the facts in <u>Ciup v.</u>

<u>Chevron U.S.A., Inc.</u> to support its argument that Denny's, Inc. has control over the Barreras

Enterprises' day-to-day operations.   In <u>Ciup v. Chevron U.S.A., Inc.</u>, the agreement between

---

[14] The initial Response cites the pages from the bottom of the Franchise Agreement, but the citations in this Memorandum Opinion reflect the CM/ECF page numbers from the docket, which appear on the top of the pages as filed with the Court.

Chevron U.S.A. and the franchisee limited Chevron U.S.A.'s control of the daily operations; there is no such limitation in the agreement between Denny's, Inc. and Barreras Enterprises.   See Response at 9.   Chevron U.S.A. did not train Barreras Enterprises' employees or managers; Denny's, Inc. trains the managers on how to implement the Denny's System.   See Response at 9. Further, Denny's, Inc. inspects Barreras Enterprises' restaurant, and requires Barreras Enterprises to operate its restaurant twenty-four hours a day and seven days a week.   See Response at 9.   The Anderson Estate argues that all of these distinctions taken together create factual issues that preclude summary judgment.   See Response at 9-10.   The Anderson Estate did not attach any evidence to its initial Response, but stated that "Denny's Inc. has not provided a copy of the Denny's Operations Manual, has not described the Denny's System or detailed the subjects and substance of the thirty day training all managers of a Denny's Franchise are required to complete to the Company's Satisfaction."   Response at 9.   The Anderson Estate argues that these additional facts will control Denny's, Inc.'s liability.   See Response at 9.

Denny's, Inc. replies that the "Plaintiff largely responds through factual interpretation," noting that the Anderson Estate did not move to strike Denny's, Inc.'s exhibits nor did it offer any new evidence.   Reply at 2.   Denny's, Inc. also points out that the Anderson Estate requested further discovery, but failed to attach a sworn affidavit under rule 56(d) of the Federal Rules of Civil Procedure, which would have allowed the Court to defer ruling on the MSJ until discovery is complete.   See Reply at 2-3.   It is unclear, from Denny's, Inc.'s perspective, how additional discovery will change the Court's analysis when the Anderson Estate has stipulated to the Franchise Agreement, and for most of the facts it disputed, did so only by denying the facts without any support or evidence.   See Reply at 3-4.   "The responding party may not rely on conclusory allegations or unsubstantiated statements of denial but, rather must come forth with

admissible evidence, such as affidavits, documents and the like, in order to properly carry its burden of rebutting the moving party's *prima facie* case." Reply at 4 (citing Scotto v. Almenas, 143 F.2d 105, 114 (2d Cir. 1998)).

Although the Anderson Estate highlighted specific aspects of the Franchise Agreement "apparently in an effort to demonstrate support for the conclusion that Denny's control is greater than that necessary merely for the protection of its brand and marks," Denny's, Inc. argues that the terms in the Franchise Agreement, including those relating to the appearance and cleanliness of the franchisee restaurants, are necessary to protect the Denny's brand, and are typical in the trade. Reply at 5. Denny's, Inc. argues that it does not control aspects beyond what is necessary to protect its brand, such as hiring and firing employees; construction, remodeling, and other improvements; and whether Barreras Enterprises provides security or otherwise tries to prevent criminal activity on its premises. Reply at 6-7. Denny's, Inc. urges the Court to consider the out-of-jurisdiction cases on which the Supreme Court of New Mexico relied on in Ciup v. Chevron USA, Inc., which explored the limits of franchisor control. See Reply at 8-11 (citing Wood v. Shell Oil Co., 495 So. 2d 1034 (Ala. 1986); Murphy v. Holiday Inns, Inc., 219 S.E.2d 874 (Va. 1975); Cislaw v. Southland Corp., 6 Cal. Rptr. 2d 386 (Cal. App. 1992)). For example, in Murphy v. Holiday Inns, Inc., the agreement between the franchisor and franchisee described the "Holiday Inn 'system' which was designed to provide 'to the public . . . an inn service . . . of distinctive nature, of high quality, and of other distinguishing characteristics.'" Reply at 9 (quoting Murphy v. Holiday Inns, Inc., 219 S.E.2d at 876). The Supreme Court of Virginia referenced the Lanham Act, 15 U.S.C. §§ 1051-1141, which requires a trademark owner to regulate the licensees' activities, because the owner may lose its mark by abandonment if the mark is used in a manner which causes the mark to lose its significance. See Reply at 10 (citing

- 23 -

Murphy v. Holiday Inns, Inc., 219 S.E.2d at 877).   In ruling as a matter of law that the franchise agreement did not create a principal/agent relationship between the franchisor Holiday Inns and the franchisee, the Supreme Court of Virginia said "the purpose of those provisions was to achieve a system wide standardization of business identity, uniformity of commercial service, and optimum public good will, all for the benefit of both contracting parties."   Reply at 10-11 (citing Murphy v. Holiday Inns, Inc., 219 S.E.2d at 878).   In Cislaw v. Southland Corp., the California Court of Appeals affirmed summary judgment for the franchisor even though, among other things, the franchisor could terminate the franchise agreement and required the franchisee to attend an operations training program, keep the store clean and equipment in good repair, open the gas station from 7 a.m. to 11 p.m., 364 days a year, and make daily deposits into accounts the franchisor designated.   See Reply at 11 (citing Cislaw v. Southland Corp., 6 Cal. Rptr. 2d at 393). "Because the franchise agreement 'withheld from the franchisor control over decisions relating to employment, inventory and day to day operations of the 7-Eleven store,' there was no agency relationship, as a matter of law, sufficient to impose vicarious liability against Southland . . . ." Reply at 11 (quoting Cislaw v. Southland Corp., 6 Cal. Rptr. 2d at 394).   Denny's, Inc. argues that, especially in light of the cases upon which the Supreme Court of New Mexico relied in Ciup v. Chevron USA, Inc., the Anderson Estate has not pointed to any factual disputes on the agency issue in this case.   See Reply at 12.

Denny's, Inc. emphasizes that recent cases have narrowed the inquiry to whether the franchisor controls the specific aspect of the franchisee business that is alleged to have caused the injuries and notes that, for this case, the proper inquiry is whether Denny's, Inc. had control over the security measures at the franchisee restaurant.   See Reply at 12.   The Anderson Estate alleges that Denny's, Inc. failed to provide a secure work environment, ensure adequate procedures for

employees' safety, operate the business in a reasonable and safe manner, and react to the foreseeability of violent crimes, see Reply at 13-14 (citing Complaint ¶ 32); yet, as Denny's, Inc. points out, the Anderson Estate ignores the evidence that the Barreras, not Denny's, Inc., had sole control over security measures, see Reply at 13.   For example, Boudakian said that

> Denny's does not make or require decisions on whether premises security is provided, the nature of any premises security, its cost, or any other issue involving measures to prevent criminal activity on or about the franchisee's premises.   These matters are within the sole control of the franchisee, specifically in this case Barreras.

Reply at 13.   Denny's, Inc. argues that it did not take on any duties to provide security at the Barreras Enterprises restaurant.   See Reply at 14.

### 2.   <u>Motion to Continue.</u>

One day after Denny's, Inc. filed its Reply, the Anderson Estate filed a Motion to Continue Defendant Denny's Inc. Summary Judgement[sic] Hearing, filed January 29, 2013 (Doc. 60)("Motion to Continue").   The Anderson Estate asked the Court to continue the hearing for the MSJ that was set for February 8, 2013, because it requested discovery from Denny's, Inc. that it believed would better allow the parties and the Court to determine Denny's, Inc.'s involvement in the franchisee restaurant.   See Motion to Continue ¶¶ 1, 7, at 1-2.   For example, the Anderson Estate wanted to complete its deposition with Boudakian, Denny's, Inc.'s compliance officer, and wanted more information on the Denny's System and the Denny's Operating Manual.   See Motion to Continue ¶¶ 2, 3, 6, at 1-2.

Denny's, Inc. responded that the Anderson Estate did not make its requests for discovery until after it filed its Response and that it did not request more time to respond within the Response, nor did it file a rule 56(d) affidavit outlining the need for further discovery.   See Response in Opposition of Denny's, Inc. to Plaintiff's Motion to Continue Summary Judgment

Hearing ¶¶ 3, 5, at 1-2, filed February 5, 2013 (Doc. 61)("Motion to Continue Response"). Denny's, Inc. argues that the Anderson Estate's efforts to continue the hearing are untimely and that the pleadings are ready for the Court's consideration.   See Motion to Continue Response ¶ 6, at 2.

### 3.    February 8, 2013 Hearing.

At a hearing on February 8, 2013, the Court first turned to the Motion to Continue.   The Anderson Estate re-urged the arguments it made in its motion, namely that it needed more discovery to determine Denny's, Inc.'s involvement in the franchisee restaurant.   See Transcript of Hearing at 4:14-5:14, taken February 8, 2013 ("Feb. Tr.")(Robinson).[15]   The Court asked why the Anderson Estate did not file a rule 56(d) affidavit, see Feb. Tr. at 6:9-10 (Court); the Anderson Estate said it thought it had accomplished the same objective as a rule 56(d) affidavit through its Response, see Feb. Tr. at 6:22-25 (Robinson).   Denny's, Inc. argued that, while it did not oppose the Anderson Estate's request for discovery, it did take issue with the Anderson Estate's failure to follow the correct procedure.   See Feb. Tr. at 7:12-25 (Hatcher).   In Denny's, Inc.'s view, the Anderson Estate filed a response on the motion's merits and did not request more time for discovery until after the parties finished briefing the MSJ; thus, the MSJ record should be closed, and the Court should hear arguments on the MSJ.   See Feb. Tr. at 8:9-23 (Hatcher).   The Court said that, without a rule 56(d) affidavit, there was no sound basis for continuing the MSJ hearing, and so it would hear arguments on the MSJ but would allow the Anderson Estate to submit supplemental briefing after the hearing if it found additional relevant information during discovery.   See Feb. Tr. at 11:7-25 (Court).

---

[15] The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.   Any final transcripts may contain slightly different page and/or line numbers.

Turning to the MSJ, Denny's, Inc. argued that the franchisee controlled the day-to-day operations, such as the right to hire and fire employees, and Denny's, Inc. was nothing more than a franchisor protecting its brands and its marks.   See Feb. Tr. at 13:5-21 (Hatcher).   Denny's, Inc. said that all of the control that it had over the franchisee, such as the right to train managers and control hours of operation, signage, menus, and food, was insufficient to impose vicarious liability.   See Feb. Tr. at 14:1-19 (Hatcher).   "But the overriding area that -- and this is absolutely undisputed on the record before the Court -- is that Denny's has absolutely no control over security measures."   Feb. Tr. at 14:20-22 (Hatcher).   Looking to Ciup v. Chevron USA, Inc., Denny's, Inc. argued that, although the case was from 1996, the trend since then has been to focus on whether the franchisor controls the specific aspect of the operation alleged to have caused the harm.   See Feb. Tr. at 17:22-18:16 (Hatcher).   The cases on which the Supreme Court of New Mexico relied in Ciup v. Chevron USA, Inc. were also more detailed, in Denny's, Inc.'s view, revealing that franchisors may train franchisee managers or employees and control the hours of operation without risking vicarious liability.   See Feb. Tr. at 20:14-22:4 (Hatcher).   Denny's, Inc. argued that, although each case depends on its facts, Denny's, Inc. exercised control over Barreras Enterprises to the extent necessary to protect its brand.   See Feb. Tr. at 22:14-23:8 (Hatcher). The Court asked at what point Denny's, Inc.'s control over the franchisee would lead to vicarious liability under New Mexico law.   See Feb. Tr. at 23:10-15 (Court).   Denny's, Inc. said that, if it had analyzed all the franchisee operations, determined that it needed to implement security measures to protect franchisee employees, and then designed security measures or protocols and required the franchisees to adopt those measures, then it would be an easy case to establish vicarious liability.   See Feb. Tr. at 23:16-24:3 (Hatcher).   Denny's, Inc. argued that, because Denny's, Inc. was not aware of criminal activity at the Barreras Enterprises' franchise, and did not

attempt to implement security measures there, Denny's, Inc. argued that the Court should not hold it vicariously liable for the Barreras Enterprises' failure to provide proper security.   See Feb. Tr. at 26:8-11 (Hatcher).

The Court asked why the Franchise Agreement had so many typographical errors and inconsistent fonts, see Feb. Tr. at 15:19-20 (Court); Denny's, Inc. said it did not know, but contended that the errors did not take away from the substance, see Feb. Tr. at 15:23-16:5 (Hatcher).   When the Court asked the Anderson Estate whether it disputed the authenticity of the Franchise Agreement, see Feb. Tr. at 27:8-13 (Court), the Anderson Estate said it questioned its authenticity, because the document differed from the Franchise Agreement that Denny's, Inc. provided in the initial disclosures, see Feb. Tr. at 28:22-29:10 (Robinson).   Denny's, Inc. said it did not compare the Franchise Agreement it attached to its MSJ and the one it produced in discovery, but it was not aware that there were any differences between the documents; even if there were, Denny's, Inc. argues, the Anderson Estate did not point to any altered provisions and so the differences were probably not material to agreement's substance.   See Feb. Tr. at 43:22-45:3 (Hatcher).

The Anderson Estate argued that Denny's, Inc. was aware of the criminal activity at the Barreras Enterprises' restaurant: Denny's, Inc. required it to be open twenty-four hours a day and seven days a week; the Franchise Agreement required Barreras Enterprises to report gross receipts to Denny's, Inc.; and when Barreras Enterprises reported its weekly gross receipts, it would have told Denny's, Inc. that it was robbed, explaining the lower gross receipts.   See Feb. Tr. at 29:12-30:9 (Robinson).   According to the Anderson Estate, the Franchise Agreement provided Denny's, Inc. control over security: if Barreras Enterprises failed inspections relating to health and safety requirements, Denny's, Inc. could terminate the agreement.   See Feb. Tr. at 31:22-32:13

(Robinson).   The Anderson Estate reiterated its arguments that it needed more discovery to know the full relationship between Denny's, Inc. and the Barreras Enterprises' franchise, specifically indicating that the operating manual and inspections might reveal that Denny's, Inc. was involved in security at the franchisee restaurant.   See Feb. Tr. at 33:2-14 (Robinson).   The Court asked, if it froze the record at that time without allowing further discovery, whether Ciup v. Chevron USA, Inc. would control and require it to grant the MSJ.   See Feb. Tr. at 39:21-40:1 (Court).   The Anderson Estate said that the Franchise Agreement raised many questions that would preclude summary judgment, such as what the inspections involved and that, further, the Franchise Agreement shows that Denny's, Inc. had more control over Barreras Enterprises than what Chevron U.S.A. had in Ciup v. Chevron USA, Inc.   See Feb. Tr. at 40:4-25 (Robinson).   The Anderson Estate agreed that the Court would need to analyze and apply Ciup v. Chevron USA, Inc.   See Feb. Tr. at 41:11-18 (Robinson).

Denny's, Inc. discussed Holiday Inns, Inc. v. Shelburne, 576 So. 2d 322 (Fla. App. 1991), a case which it identified in its MSJ as in the minority of jurisdictions, holding the franchisor liable for its own direct negligence for failing to provide proper security.   See Feb. Tr. at 45:9-15 (Hatcher).   Denny's, Inc. argued that, unlike that case, it did not do anything to directly cause Anderson's death, and further, that case found the franchisor liable based on apparent authority, which would not apply in this case, because the injured plaintiff is an employee rather than a customer.   See Feb. Tr. at 45:14-46:11 (Hatcher).   Although the Anderson Estate argued that Denny's, Inc. would have had knowledge of prior crimes at the Barreras Enterprises' franchise restaurant, Denny's, Inc. points out that the Anderson Estate raised that argument for the first time at the hearing and did not support it with evidence; there is thus no evidence to dispute Boudakian's testimony in his affidavit that Denny's, Inc. did not have knowledge of any prior

crimes.  See Feb. Tr. at 47:1-14.  Of the remaining points that the Anderson Estate raised -- that Denny's, Inc. could inspect Barreras Enterprises' restaurant for health and safety, could terminate the Franchise Agreement, and required the restaurant operate twenty-four hours a day and seven days a week -- Denny's, Inc. argued that it identified cases where that level of control did not create a factual question on agency and that the Anderson Estate did not point to any authority in its Response that would indicate otherwise.  See Feb. Tr. at 47:15-49:22 (Hatcher).

The Court noted that the record included only the Franchise Agreement and the Boudakian Aff., but it would allow the Anderson Estate to conduct additional discovery and submit additional evidence to the Court.  See Feb. Tr. at 51:9-25.

**5.**     **Additional Briefing and Oral Arguments.**

The Anderson Estate filed its Second Response to the MSJ on May 14, 2013, and repeats many of its same arguments regarding what the Franchise Agreement requires.   Second Response at 6-9.  The Anderson Estate said it deposed Boudakian and described his testimony, but the Anderson Estate failed to attach the deposition transcript to its Second Response.  See Second Response at 9-18.  It described several times in the deposition where Boudakian said that Denny's, Inc. does not inspect or require security at the franchisee restaurants, see Second Response at 10, 12, and that the franchisee employees do not work for Denny's, Inc., see Second Response at 11, but detailed what Denny's, Inc. examines during inspections, such as the temperature of food serviced, whether the restaurant carpet bunched up, whether there was a thermometer in the butter cooler, and how long it took for employees to bus the tables after guests left the restaurant, see Second Response at 11-12.   The Anderson Estate explained that Denny's, Inc. teaches its managers of corporate-owned restaurants certain security measures, such as how to manage cash and make bank deposits securely.  See Second Response at 14.   Denny's, Inc. also

provides the corporate-owned restaurants with "Best Practices" in dealing with security issues, such as a disruptive guest, but it directs the franchisee managers to talk to the franchisee about how to deal with those situations rather than requiring adherence to the "Best Practices."   Second Response at 15-16.

The Anderson Estate notes that <u>Ciup v. Chevron USA, Inc.</u> controls this case, but that the control Denny's, Inc. has over the franchisee restaurant is much greater than what Chevron had over the franchisee gas station.   <u>See</u> Second Response at 20.   It argues that Denny's, Inc. requires security at the company-owned restaurants, but instructs franchisee employees "not to provide the answers that are available to corporate employees."   Second Response ¶ 2, at 20.   The Anderson Estate attached several documents to its Second Response, including the security policy for corporate-owned restaurants, <u>see</u> Denny's, Inc. Policy Security Service Agency Policy for Security Guards, filed May 14, 2013 (Doc. 75-1 at 1); Best Practice Learning Aid: Disruptive Guest, filed May 14, 2013 (Doc. 75-1 at 8); Hospitality, Quality & HACCP Review, filed May 14, 2013 (Doc. 75-2); and Food Safety, Standards & Regulatory Review, filed May 14, 2013 (Doc. 75-3).

Denny's, Inc. argues that the Anderson Estate has not demonstrated any qualitative distinction between this case and <u>Ciup v. Chevron USA, Inc.</u>, and that the Anderson Estate has failed to respond to the argument that Denny's, Inc. does not have control over Barreras Enterprises' security measures.   <u>See</u> Second Reply at 13.   Denny's, Inc. argues that ensuring uniformity in customer experience does not open up the company to vicarious liability: "'The clear trend in the case law in other jurisdictions is that the quality and operational standards and inspection rights do not establish a franchisor's control or right of control over the franchisee sufficient to ground a claim for vicarious liability as a general matter.'"   Second Reply at 14

(quoting Allen v. Greenville Hotel Partners, Inc., 409 F. Supp. 2d 672, 677 (D.S.C. 2006)).   It says that the Anderson Estate has not provided any authority to support the argument that what Denny's, Inc. has done goes beyond protecting its trademark.   See Second Reply at 14.   Denny's, Inc. attached portions of Boudakian's deposition to its Second Reply.   See Boudakian Depo.

The Court held a hearing on November 5, 2013.   See Transcript of Hearing, taken November 5, 2013 ("Nov. Tr.").   The Court opened the hearing by asking the parties what law should apply to determine Denny's, Inc.'s and the Barreras' relationship: the Franchise Agreement included a provision stating that California law governs the agreement, but the parties had been analyzing the issue using New Mexico law.   See Nov. Tr. 3:16-25 (Court).   Denny's, Inc. acknowledged the provision in the Franchise Agreement choosing California law, but said that it would not apply in this case, because the incident arose in New Mexico, with a New Mexico restaurant and a New Mexico resident.   See Nov. Tr. 11:15-12:5 (Hatcher).   The Court said that its first reaction was likewise to apply New Mexico law, because "this is a tort case," and the agreement that the corporation entered into with another party does not govern a New Mexico resident bringing a tort case against the corporation; but its second thought is that this question involves a determination of agency law and how the agreement governs the relationship of the parties.   Nov. Tr. 12:6-24 (Court).   Denny's, Inc. argued that, even if California law should apply, the analysis remains the same, because the leading New Mexico case, Ciup v. Chevron USA, Inc., cites and relies on a California case, Cislaw v. Southland, indicating that applying New Mexico law or California law would bring the Court to the same conclusion.   See Nov. Tr. 13:1-14 (Hatcher).   Going on to analyze the facts of that case, Denny's, Inc. argued that, even when the franchisor has authority to terminate a franchise agreement and require the franchisee to participate in a training program, keep the store clean and equipment in good repair, operate from

7:00 a.m. to 11 p.m., 364 days a year, make daily deposits into a franchisor-designated account, pay royalty fees, and provide copies of purchase and sales records, similar to the relationship between Denny's, Inc. and the Barreras Enterprises, the California Court of Appeals affirmed the grant of summary judgment to the franchisor, holding that there was not an agency relationship. See Nov. Tr. 13:20-14:22 (Hatcher).   Denny's, Inc. discussed the trend in the law that it saw: that even large companies such as McDonald's can require the franchisees to abide by the franchisor's system, and not subject itself to vicarious liability, and that courts are narrowing the circumstances in which they find vicarious liability, looking specifically to whether the franchisor controls the specific instrumentality alleged to have caused an injury or death.   See Nov. Tr. 15:1-19 (Hatcher).   Denny's, Inc. summed up its position by emphasizing Boudakian's testimony that Denny's, Inc. imposes certain standards on the franchisees to protect its mark, because it wants customers to have the same experience in Maine as in Los Angeles.   See Nov. Tr. at 16:13-21 (Hatcher).   In Denny's, Inc.'s view, this amount of control is necessary to protect its trademark under the Lanham Act and, further, to enable the franchise business model to flourish, creating tens of thousands of small business owners around the country.   See Nov. Tr. at 17:1-18:1 (Hatcher).   The Court asked why, if it found that Denny's, Inc. was involved in the day-to-day operations of the franchisee, it should not find Denny's, Inc. vicariously liable for security issues. See Nov. Tr. at 18:11-16 (Court).   Denny's, Inc. said that, although it provides security guards at company-owned restaurants, there is no evidence of it providing or requiring security of any kind at franchisee-owned restaurants, and that, following the trend in the law, this fact would allow the Court to grant summary judgment even if it found that Denny's, Inc. was otherwise involved in the day-to-day operations of the franchisee.   See Nov. Tr. 18:18-19:13 (Hatcher).

The Anderson Estate expressed concern that Denny's, Inc. could intentionally choose to

teach security issues to its company-owned restaurants, and then turn around and intentionally withhold that information from its franchisee-owned restaurants.  See Nov. Tr. at 19:23-20:4 (Robinson).  It stated its belief that New Mexico liability law would follow insurance, and so requested that Denny's, Inc. produce the insurance policy and indicate whether Denny's, Inc. purchased liability insurance to cover security issues that occur at franchisee-owned restaurants. See Nov. Tr. at 20:8-13 (Robinson).  Regarding which law should apply, the Anderson Estate argued that California law should apply, because Denny's, Inc. chose that law when it entered into the Franchise Agreement, and that, if any jurisdiction were to create liability for failing to provide proper security, it would be California.  See Nov. Tr. at 21:1-7, 21:23-22:10 (Robinson).  The Anderson Estate argued that Denny's, Inc. was involved in the day-to-day operations, especially because of the specific training and requirements, such as how often the manager should touch a table when interacting with guests and the temperature of the cooler.  See Nov. Tr. at 20:19-24 (Robinson).  The Court asked how a franchisor could protect its trademark and not expose itself to vicarious liability, see Nov. Tr. at 22:15023 (Court), to which the Anderson Estate responded that, "in this day and age," when a company creates a national chain that may attract criminal activity, the company should not be able to avoid getting involved in security issues as it argues Denny's, Inc. has, Nov. Tr. at 22:24-24:9 (Robinson).  When asked how the security measures taken at company-owned restaurants impacts the analysis for franchisee-owned restaurants, see Nov. Tr. at 24:24-25:1 (Court), the Anderson Estate responded that Denny's, Inc. has carefully tried to insulate itself on franchisee-owned restaurants, and it should not be able to do so when it has information about how to provide proper security, as demonstrated through the company-owned restaurants, see Nov. Tr. 25:2-24 (Robinson).

        Denny's, Inc. responded that it does not insure the Barreras Enterprises' operations in any

way, and so the Anderson Estate's argument about looking to Denny's, Inc.'s insurance would not

expose it to vicarious liability.   See Nov. Tr. at 26:24-27:4 (Hatcher).

     **5.**     **Choice-of-Law Minute Order and Letters.**

On November 8, 2013, the Court issued a Minute Order:

> MINUTE ORDER, pursuant to the direction of District Judge James O. Browning,
> regarding the following: in the Joint Status Report and Provisional Discovery Plan,
> filed January 3, 2013 (Doc. 48)("Status Report"), the parties stipulated and agreed
> "that the law governing this case is the law of the State of New Mexico."   Status
> Report 4, at 3.   The Court questions whether New Mexico law governs the issue
> whether an agency relationship exists between Denny's, Inc. and Barreras
> Enterprises, for the purposes of determining vicarious liability, because the
> Franchise Agreement indicates that it shall be governed by and construed in
> accordance with the laws of the State of California.   See Franchise Agreement
> § 22.11, at 34, filed October 26, 2012 (Doc. 40-1).   The parties are directed to
> inform the Court as soon as possible if they want to continue to be bound by their
> stipulation in the Status Report that New Mexico law applies to the issue whether
> an agency relationship exists between Denny's, Inc. and Barreras Enterprises.

Minute Order, filed November 8, 2013 (Doc. 96).   Denny's, Inc. and the Barreras Defendants,

including Barreras Enterprises, Frank H. Barreras, June R. Barreras, and Judith A. Barreras, said

that they agreed to be bound by the stipulation order.   See Letter to District Judge James O.

Browning from Scott P. Hatcher, filed November 11, 2013 (Doc. 98)("In response to the Court's

directive, be advised that Denny's, Inc. wishes to remain bound by the party's stipulation in the

Joint Status Report that New Mexico law applies on this issue."); Letter to District Judge James O.

Browning from Paul Maestas ("I am writing to let you know that the Barreras Defendants agree to

be bound by the stipulation continued in the Joint Status Report and Provisional Discovery Plan

'that the law governing this case is the law of the State of New Mexico.'").   The Anderson Estate

said that it "chooses to reject the parties' stipulation in the Joint Status Report that New Mexico

law applies and requests the Court look to California Law."   Letter to District Judge James O.

Browning from Shannon Robinson, filed November 12, 2013 (Doc. 99).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Schs., No. CIV 11-0422 JB/KBM, 2013 WL 3462484, at *23 (D.N.M. June 28, 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or

denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).   Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).   "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.   A mere "scintilla" of evidence will not avoid summary judgment.   Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).   Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.   See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.   "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.   If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson

v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).   Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.   See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.   First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.   See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.   Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.   Third, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.   See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").   Fourth, the court cannot decide any issues of credibility.   See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## RELEVANT LAW REGARDING NEW MEXICO CHOICE-OF-LAW RULES

Where a plaintiff invokes a federal district court's diversity jurisdiction, the district court looks to the forum state's choice-of-law rules to determine which state's substantive law to apply. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).   The first step in a New Mexico choice-of-law analysis is to characterize the claim by "area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue." Terrazas v. Garland & Loman, Inc., 140 N.M. 293, 296, 142 P.3d 374, 377 (Ct. App. 2006).

There are only a few categories within which claims might fall -- "[t]ort cases, i.e. all 'civil wrongs,' are one class; contracts, i.e., every kind of enforceable promise, is another single class." J. McLaughlin, Conflict of Laws: the Choice of Law Lex Loci Doctrine, the Beguiling Appeal of a Dead Tradition, Part One, 93 W. Va. L. Rev. 957, 989 (1991)(describing the categories as "tort, contract, or some other").   The court is then to apply the New Mexico choice-of-law rule applicable to that category of claim to determine what state's substantive law to apply.  See Guidance Endodontics, LLC v. Dentsply Intern., Inc., 749 F. Supp. 2d 1235, 1257 (D.N.M. 2010)(Browning, J.).

When a claim sounds in contract, New Mexico will generally apply the choice-of-law rule of *lex loci contractus* -- the law of the place of contracting.  See Ferrell v. Allstate Ins. Co., 144 N.M. 405, 421, 188 P.3d 1156, 1172 (2008).   Like most states, however, "New Mexico respects party autonomy; [therefore] the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision."  Fiser v. Dell Computer Corp., 144 N.M. 464, 467, 188 P.3d 1215, 1218 (2008)(citing NMSA 1978, § 55-1-301(A)).   See United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 108 N.M. 467, 470, 775 P.2d 233, 236 (1989).  "[W]hen application of the law chosen by the parties offends New Mexico public policy," however, a New Mexico court "may decline to enforce the choice-of-law provision and apply New Mexico law instead."  Fiser v. Dell Computer Corp., 144 N.M. at 467, 188 P.3d at 1218.  "New Mexico courts will not give effect to another state's laws where those laws would violate some fundamental principle of justice."  Fiser v. Dell Computer Corp., 144 N.M. at 467, 188 P.3d at 1218 (internal quotations omitted).   Where the plaintiff has invoked the federal district court's diversity jurisdiction, the court will accept New Mexico's law regarding whether to honor a contractual choice-of-law provision.  See MidAmerica Constr. Mgmt., Inc. v. MasTec N.

Am., Inc., 436 F.3d 1257, 1260 (10th Cir. 2006)("In cases like this one, where subject matter jurisdiction is based on diversity of citizenship, federal courts must look to the forum state's choice-of-law rules to determine the effect of a contractual choice-of-law clause.").

On the other hand, if the underlying claim is categorized as a tort, "New Mexico courts follow the doctrine of *lex loci delicti commissi* -- that is, the substantive rights of the parties are governed by the law of the place where the wrong occurred."   Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377.   The *lex loci delicti* rule defines the state where the wrong occurred as "the state where the last event necessary to make an actor liable for an alleged tort takes place."   Zamora v. Smalley, 68 N.M. 45, 47, 358 P.2d 362, 363 (1961).   See Restatement (First) Conflicts of Law § 377 & cmt. a (1934).   Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred.   See First Nat'l Bank in Albuquerque v. Benson, 89 N.M. 481, 482, 553 P.2d 1288, 1289 (Ct. App. 1976)(referring to the rule as requiring application of "the law of the State of injury"); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 663 F. Supp. 2d 1138, 1150-51 (D.N.M. 2009)(Browning, J.).

## RELEVANT NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause of the plaintiff's damages.   See Coffey v. United States, 870 F. Supp. 2d 1202, 1225 (D.N.M. 2012)(citing Herrera v. Quality Pontiac, 134 N.M. 43, 47-48, 73 P.3d 181, 185-86 (2003).   "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." Ramirez v. Armstrong, 100 N.M. 538, 541, 673 P.2d 822, 825 (1983), overruled on other grounds by Folz v. State, 110 N.M. 457, 460, 797 P.2d 246, 249 (1990).   Generally, negligence is a

question of fact for the jury.   See Schear v. Bd. of County Comm'rs, 101 N.M. 671, 672, 687 P.2d

728, 729 (1984).   "A finding of negligence, however, is dependent upon the existence of a duty on

the part of the defendant."   Schear v. Bd. of County Comm'rs, 101 N.M. at 672, 687 P.2d at 729.

"Whether a duty exists is a question of law for the courts to decide."   Schear v. Bd. of County

Comm'rs, 101 N.M. at 672, 687 P.2d at 729 (citation omitted).   Once courts recognize that a duty

exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce

the risk of harm to an individual or class of persons."   Baxter v. Noce, 107 N.M. 48, 51, 752 P.2d

240, 243 (1988).

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the

inquiry into whether the defendant owed a duty to the plaintiff.   See Herrera v. Quality Pontiac,

134 N.M. at 48, 73 P.3d at 186.   The New Mexico courts have recognized that, "[u]ltimately, a

duty exists only if the obligation of the defendant [is] one to which the law will give recognition

and effect."   Herrera v. Quality Pontiac, 134 N.M. at 49, 73 P.3d at 187 (internal quotation marks

omitted).   To determine whether the defendant's obligation is one to which the law will give

recognition and effect, courts consider legal precedent, statutes, and other principles of law.

See Herrera v. Quality Pontiac, 134 N.M. at 48, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm."   Grover v.

Stechel, 132 N.M. 140, 143, 45 P.3d 80, 84 (Ct. App. 2002).   "[C]ertain relationships, however,

that give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors

of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to

deprive the other of his normal opportunities for protection."   Grover v. Stechel, 132 N.M. at 143,

45 P.3d at 84.   "[W]hen a person has a duty to protect and the third party's act is foreseeable,

'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the

[person who has a duty to protect] from being liable for harm caused thereby.'"   Reichert v. Atler,

117 N.M. 623, 626, 875 P.2d 379, 382 (1994).

"[T]he responsibility for determining whether the defendant has breached a duty owed to

the plaintiff entails a determination of what a reasonably prudent person would foresee, what an

unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in

light of all the surrounding circumstances."   Herrera v. Quality Pontiac, 134 N.M. at 56, 73 P.3d

at 194.   "The finder of fact must determine whether Defendant breached the duty of ordinary care

by considering what a reasonably prudent individual would foresee, what an unreasonable risk of

injury would be, and what would constitute an exercise of ordinary care in light of all surrounding

circumstances of the present case . . . ."   Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at

195.

"A proximate cause of an injury is that which in a natural and continuous sequence

[unbroken by an independent intervening cause] produces the injury, and without which the injury

would not have occurred."   Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.   "It need

not be the only cause, nor the last nor nearest cause."   Herrera v. Quality Pontiac, 134 N.M. at 57,

73 P.3d at 195.   "It is sufficient if it occurs with some other cause acting at the same time, which

in combination with it, causes the injury."   Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at

195.

### RELEVANT NEW MEXICO LAW REGARDING
### FRANCHISOR VICARIOUS LIABILITY

"Franchising is a system for the selective distribution of goods and/or services under a

brand name through outlets owned by independent businessmen, called 'franchisees.'"   Murphy

v. Holiday Inns, Inc., 219 S.E.2d 874, 877 (Va. 1975)(citing R. Rosenberg, Profits From

Franchising 41 (1969)).   The franchisor provides the "knowhow and brand identification," and the franchisee "enjoys the right to profit and runs the risk of loss."   Murphy v. Holiday Inns, Inc., 219 S.E.2d at 877.   "The franchisor controls the distribution of his goods and/or services through a contract which regulates the activities of the franchisee, in order to achieve standardization." Murphy v. Holiday Inns, Inc., 219 S.E.2d at 877.   The existence of a franchise agreement does not, however, insulate the contracting parties from an agency relationship or vicarious liability. See Murphy v. Holiday Inns, Inc., 219 S.E.2d at 877.   Franchisors are in a unique position regarding potential vicarious liability, because the Lanham Act "places an affirmative duty upon a licensor of a registered trademark to take reasonable measures to detect and prevent misleading uses of his mark by his licensees or suffer cancellation of his federal registration."   Rainey v. Langen, 998 A.2d 342, 348 (Me. 2010)(quoting Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 366 (2d Cir. 1959)).   "The criteria regarding the control necessary to satisfy the Lanham Act is whether such control guarantees that third parties dealing with the franchisee will receive goods or services of the quality which they have learned to associate with the trademark."   Greil v. Travelodge Intern., Inc., 541 N.E.2d 1288, 1292 (Ill. App. Ct. 1989).   "[F]ranchisors are often caught between the Scylla of failing to exercise sufficient control to protect their marks, and the Charybdis of exercising so much control they are vicariously liable for the torts of the franchisees or other licensees."   People v. JTH Tax, Inc., 151 Cal. Rptr. 3d 728, 744 (Cal. Ct. App. 2013)(quoting the trial court opinion).

There are few cases and limited guidance in New Mexico addressing franchisor vicarious liability.   A franchisor may be vicariously liable for the franchisee's torts, depending on the degree of control the franchisor exercises or has a right to exercise over the franchisee.   See Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶ 5.   Whether the franchisee is the franchisor's agent

centers primarily on whether the franchisor has right to control the day-to-day operations of the franchisee.  See Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶ 5.   The analysis distinguishes controlling the "result to be procured" from controlling "the means to be used in reaching that result," as the latter indicates control over the day-to-day operations.

> Where the employee is subject only to the control or direction of the employer as to the result to be procured, he is an independent contractor; if he is subject to the control of the employer as to the means to be used in reaching that result, he is an employee.

Shaver v. Bell, 1964-NMSC-255, 74 N.M. 700, 704, 397 P.2d 723, 727 (using the terms "employer," "independent contractor," and "employee" in the context of franchisor vicarious liability).   "The degree of control giving rise to liability depends on the particular facts of each case."  Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶ 5.  Franchise agreements may provide a franchisor with control over a franchisee's day-to-day operations, see Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶ 10, but exercising control to protect the franchisor's trademark is insufficient to lead to vicarious liability, see Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶ 13.

In Chevron Oil Co. v. Sutton, 1973-NMSC-111, 85 N.M. 679, 515 P.2d 1283, the plaintiff's wife died in a car accident when a wheel that the franchisee's employee repaired came off the vehicle.   See Chevron Oil Co. v. Sutton, 85 N.M. at 681, 515 P.2d at 1285.   Although Chevron Oil Company, the franchisor, and Lee Sharp, the lessee/franchisee, had an agreement that stated that Sharp was an independent business and that nothing in the agreement should be construed as giving Chevron Oil any right to control Sharp's business or operations, the Supreme Court of New Mexico said that "the manner in which the parties designate a relationship is not controlling, and if an act done by one person on behalf of another is in its essential nature one of agency, the one is the agent of the other, notwithstanding he is not so called."   85 N.M. at 681, 515

- 44 -

P.2d at 1285.   "Furthermore, it has long been the rule that a third person who deals with an agent

is not bound by any secret or private instructions given to an agent by the principal."   85 N.M. at

681, 515 P.2d at 1285.   The Supreme Court of New Mexico concluded that there was a substantial

dispute as to a material fact -- "whether or not Chevron exercised such control over Sharp as to

bring the doctrine of respondeat superior into play" -- precluding summary judgment.   85 N.M. at

682, 515 P.2d at 1286.   The Supreme Court of New Mexico noted that so-called "independent

stations" were required to:

> (1) diligently promote the sale of Chevron's brand products; (2) remain open for
> certain hours and days and 'meet the operating hours of competitors'; (3) keep the
> premises, restrooms and equipment in a 'clean and orderly condition'; (4) present a
> 'good appearance'; and (5) promote Chevron's image to the motoring public.   In
> addition, Sharp also (6) sold Chevron products and dispensed gasoline and oil
> provided by the Chevron organization; (7) received the benefit of Chevron
> advertising; (8) wore uniforms containing the Chevron emblem; (9) used calling
> cards which billed the station as 'Lee Sharp Chevron and Four Wheel Drive
> Equipment' (apparently with Chevron's consent); and (10) the customers of the
> Sharp station were permitted to charge purchases of both products and repairs on
> Chevron credit cards.

85 N.M. at 682, 515 P.2d at 1286.   The Supreme Court of New Mexico did not rely specifically on

one factor, but considered all of the factors together and determined that there was "a sufficient

factual question as to whether or not there was an actual master-servant relationship."   85 N.M. at

682, 515 P.2d at 1286.   After finding that a factual question existed on actual agency, the Supreme

Court of New Mexico stated that, even if there was not a material issue for actual agency, there was

a material issue regarding whether Chevron Oil "had clothed the lessee with apparent authority."

85 N.M. at 682, 515 P.2d at 1286.   Apparent agency exists when the principal "by his acts or

conduct has clothed the agent with the appearance of authority," and a third party is "justified in

believing that the agent is acting within his authority."   Chevron Oil Co. v. Sutton, 85 N.M. at

682, 515 P.2d at 1286 (quoting 3 Am. Jur. 2d Agency § 74).   Chevron Oil knew that Sharp was

- 45 -

opening an automobile repair shop, allowed Sharp to open and run the repair shop, and advertised that the repairmen were skillful, and the plaintiff relied on such statements and additional signs indicating that Chevron Oil controlled the repair shop.   See Chevron Oil Co. v. Sutton, 85 N.M. at 683, 515 P.2d at 1287.   The Supreme Court of New Mexico concluded that a material question of fact existed as to "whether or not Sharp had been clothed with apparent authority by Chevron to act as Chevron's agent."   Chevron Oil Co. v. Sutton, 85 N.M. at 683, 515 P.2d at 1287.

The next, and most recent, Supreme Court of New Mexico case on the issue of vicarious liability for franchisors is from 1996: Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062.   In Ciup v. Chevron U.S.A., Inc., a gas station attendant and the personal representative for a visitor to the gas station sued Nicolae Spilca, the operator and lessee of the gas station, Rio Grande Oil, the owner-lessor of the gas station and distributor of Chevron, and Chevron U.S.A., who manufactured the gasoline sold at the Chevron-branded station, for personal injury and wrongful death arising from an attempted robbery of the station.   See 1996-NMSC-062 ¶ 2.   The Supreme Court of New Mexico analyzed whether Chevron U.S.A. "retained sufficient control to give rise to a duty to ensure that the Spilca gas station was operated in a safe manner."   1996-NMSC-062 ¶ 6. Chevron U.S.A. argued that its involvement with the Spilca station was limited to protecting its trademark, which could not give rise to a duty to protect the premises.   See 1996-NMSC-062 ¶ 6. To carry its burden on that point, Chevron U.S.A. submitted contracts between it and Rio Grande Oil to demonstrate that it did not control the day-to-day activities of the station, including an agreement that stated:

> In the performance of this agreement [Rio Grande Oil] is engaged in an independent business and nothing herein contained shall be construed as granting [Chevron] any right to control or direct [Rio Grande Oil] with respect to [Rio Grande Oil's] conduct of such business.  [Chevron] has no right to exercise any control over any of [Rio Grande Oil's] employees, all of whom are entirely under

the control and direction of [Rio Grande Oil], who shall be responsible for their actions and omissions.

1996-NMSC-062 ¶ 11.   The Supreme Court of New Mexico held that this contract provision was an "express showing of the lack of an agency relationship between Chevron and Rio Grande." 1996-NMSC-062 ¶ 11.   The burden then shifted to the plaintiffs to establish the existence of a material issue regarding Chevron U.S.A.'s right to control the operations.   1996-NMSC-062 ¶ 11. The plaintiffs asserted that Chevron took three affirmative steps to control the gas station's operation:

> (1) Chevron sent inspectors to the site twice a year to check on the image, inspect the gasoline and oil products, and provide promotional materials; (2) Chevron posted a toll-free number at the station where customers could voice their concerns; and (3) Chevron placed restrictions on the sale or rental of pornographic materials at the station.

1996-NMSC-062 ¶ 12.   The Supreme Court of New Mexico rejected the plaintiffs' arguments that these steps demonstrated sufficient control over the gas station's operation, because "protecting a trademark does not constitute sufficient control over the gas station's operation under existing case law."   1996-NMSC-062 ¶ 13.   The Supreme Court of New Mexico affirmed the trial court's decision to grant Chevron U.S.A.'s motion for summary judgment.   See 1996-NMSC-062 ¶ 20.

### NEW MEXICO LAW REGARDING *RESPONDEAT SUPERIOR*

"Generally, whether an employee is acting in the course and scope of employment is a question of fact."   Rivera v. N.M. Highway and Transp. Dept., 115 N.M. 562, 564, 855 P.2d 136, 138 (Ct. App. 1993)(citing Narney v. Daniels, 115 N.M. 41, 48, 846 P.2d 347, 354 (Ct. App. 1992)).   "However, when no reasonable trier of fact could conclude that an employee is acting in the course and scope of employment," the conduct was not in the scope of employment as a matter

of law.  Rivera v. N.M. Highway and Transp. Dept., 115 N.M. at 564, 855 P.2d at 138 (citing

Narney v. Daniels, 115 N.M. at 49-50, 846 P.2d at 355-56).   "Under basic respondeat superior

principles, an employer is liable for an employee's torts committed within the scope of his or her

employment."  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1271 (D.N.M. 2010)(Browning,

J.)(quoting Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 29, 135 N.M. 539, 91 P.2d 58).

However, "an employer is not generally liable for an employee's intentional torts because an

employee who intentionally injures another individual is generally considered to be acting outside

the scope of his or her employment."  Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 29, 135

N.M. 539, 91 P.2d 58 (citing Martin-Martinez v. 6001, Inc., 1998 NMCA-179, ¶ 13, 126 N.M.

319, 968 P.2d 1182 ("In most instances, the intentional conduct of an employee injuring another

employee is not the intentional conduct of the employer.")).   New Mexico uses a four-part test to

determine whether an employee's acts were performed within the scope of employment:

> An employee's action, although unauthorized, is considered to be in the scope of
> employment if the action (1) is the kind the employee is employed to perform; (2)
> occurs during a period reasonably connected to the authorized employment period;
> (3) occurs in an area reasonably close to the authorized area; and (4) is actuated, at
> least in part, by a purpose to serve the employer.

Lessard v. Coronado Paint & Decorating Ctr., Inc., 2007-NMCA-122, ¶ 12, 142 N.M. 583, 168

P.3d 155 (citing Narney v. Daniels, 115 N.M. at 49, 846 P.2d at 355; Restatement (Third) of

Agency § 7.07(2) (2006)).  The New Mexico Civil Uniform Jury Instruction on the scope of

employment provides:

> An act of an employee is within the scope of employment if:
>
> **1.**  It was something fairly and naturally incidental to the employer's business
> assigned to the employee, and
>
> **2.**  It was done while the employee was engaged in the employer's business with
> the view of furthering the employer's interest and did not arise entirely from some

external, independent and personal motive on the part of the employee.

Civ. U.J.I. 13-407 N.M.R.A.   See Childers v. S. Pac. Co., 20 N.M. 366, 372-73, 149 P. 307, 308, (1915)(same).

The Supreme Court of New Mexico has also recognized that New Mexico courts' adoption of the "aided-in-agency theory of vicarious liability . . . . would [not] be a radical departure." Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶¶ 30-31, 135 N.M. 539, 91 P.2d 58.   The Supreme Court of New Mexico stated that, under the aided-in-agency theory, "an employer may be held liable for the intentional torts of an employee acting outside the scope of his or her employment if the employee 'was aided in accomplishing the tort by the existence of the agency relation [between the employer and employee].'"   Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 30, 135 N.M. 539, 91 P.2d 58 (quoting Restatement (Second) of Agency § 219(2)(d)).

## ANALYSIS

The Court will deny the MSJ.   The Court concludes that New Mexico choice-of-law rules require application of New Mexico substantive law to determine whether there is vicarious liability, and although there is less than robust guidance from New Mexico law, the Court concludes that New Mexico courts would find a factual issue regarding Denny's, Inc.'s relationship with Barreras Enterprises sufficient to preclude summary judgment on vicarious liability and submit to the jury the question whether Denny's, Inc. controlled the day-to-day operations of the franchisee restaurant.   Although modern cases have recognized an instrumentality rule, the most recent Supreme Court of New Mexico case relied on the traditional rule, and the Court is not free to deviate from that rule; moreover, the Court predicts that, if confronted by the issue, the Supreme Court of New Mexico would adopt the instrumentality rule only as an alternative test to the means test set forth in Ciup v. Chevron U.S.A., Inc. and only then

to the extent it helps the individual plaintiff, not the franchisor.

## I.   NEW MEXICO CHOICE-OF-LAW ANALYSIS REQUIRES APPLICATION OF NEW MEXICO SUBSTANTIVE LAW.

The Court has diversity jurisdiction over this wrongful death and negligence action under 28 U.S.C. § 1332(a)(1).   The Anderson Estate, the Plaintiff in this case, takes on the decedent's citizenship, see 28 U.S.C. § 1332(c)(2); because Stephanie Anderson was domiciled in New Mexico at the time of her death, the Anderson Estate is deemed to be a New Mexico citizen.   The Anderson Estate is suing Denny's, Inc., a Florida corporation with its principal place of business in South Carolina; Barreras Enterprises, Inc., a Texas corporation; Frank H. Barreras, June R. Barreras, and Judith A. Barreras, Texas citizens; and Jose Humberto Melgar-Cabrera, Marvin Antonio Aguilar-Lopez, and Pablo de Leon Ortiz, El Salvador citizens who were in the United States illegally.   There is complete diversity between the plaintiffs and the defendants, and the amount in controversy exceeds $75,000.

Because the Court has diversity jurisdiction over this case, it must apply New Mexico choice-of-law rules to determine what substantive law applies.   See Mosley v. Titus, 762 F. Supp. 2d 1298, 1313-14 (D.N.M. 2010)(Browning, J.)(stating that, when a court's jurisdiction rests on diversity of citizenship under § 1332, "the court should look to the forum state's choice-of-law rules to determine which state's substantive law to apply"); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo., Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).   New Mexico choice-of-law analysis involves two steps: first, "the Court must characterize 'the area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue.'"   Mosley v. Titus, 762 F. Supp. 2d at 1314 (quoting Terrazas v. Garland & Loman, Inc., 2006-NMCA-111 ¶ 11).   Second, the Court must

apply New Mexico's choice-of-law rule for that area of substantive law.   See Mosley v. Titus, 762 F. Supp. 2d at 1314 (citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111 ¶ 12).

The first step of characterizing the issue or claim is, in many cases, "simple and uncontroversial: a self-evident intuition."   J. McLaughlin, supra, at 988.   The Restatement (First) of the Conflict of Laws and Professor Joseph H. Beale of Harvard Law School, author of an exhaustive treatise on the conflict of laws and "the grand guru of lex loci," J. McLaughlin, supra at 966, did not view this characterization as a difficult question: neither mention how to characterize the cause of action, but "apparently followed the 'just know' rule (e.g., 'you just know that's a tort case,' 'that there's a property case,' etc.)," J. McLaughlin, supra at 989.   Not every case is so clear, however, and this case raises a difficult question of characterization.   "Any case involving vicarious liability for tortious conduct is a problem in classification; does liability grow out [of] the contractual relationship between the defendant and tortfeasor, or does liability grow out of the tortious conduct?"   J. McLaughlin, supra at 989.   There is no doubt that the overall claim before the Court sounds in tort law: the Anderson Estate alleges that Denny's, Inc. and Barreras Enterprises negligently failed to provide proper security at the Denny's restaurant, leading to Anderson's wrongful death.   See Amended Complaint ¶ 27, at 7.   Between the Anderson Estate and Barreras Enterprises, that ends the analysis: New Mexico choice-of-law rules would apply New Mexico substantive law as the *lex loci delicti*, the law of the place of the wrong.   See Torres v. State, 1995-NMSC-025, 119 N.M. 609, 613, 894 P.2d 386, 390.

Between the Anderson Estate and Denny's, Inc., however, the characterization is more difficult.   Denny's, Inc. argues that it does not have control over security issues at the Denny's restaurant, and does not control the day-to-day operations beyond what is necessary to protect its brand and marks.   See MSJ at 2.   Denny's, Inc. argues that Barreras Enterprises is not its agent.

The Franchise Agreement between Denny's, Inc. and Barreras Enterprises informs, at least in part, the relationship between the two, including whether Denny's, Inc. has control over the franchisee's day-to-day operations.   If characterized as a contract issue, New Mexico will generally apply the *lex loci contractus* -- the law of the place of contracting, see Ferrell v. Allstate Ins. Co., 144 N.M. at 421, 188 P.3d at 1172; or will apply the law the parties chose through a contractual choice-of-law provision, see Fiser v. Dell Computer Corp., 2008-NMSC-046 ¶ 7 (citing NMSA 1978, § 55-1-301(A)).   Although it is not clear from the record where Denny's, Inc. and Barreras Enterprises contracted, the Franchise Agreement indicates that it "shall be governed by and construed [i]n accordance with the [l]aws of the State of California."   Franchise Agreement ¶ 22.11, at 30.   If characterized as a contract issue, New Mexico would thus likely apply California law.

Although the Supreme Court of New Mexico addressed a similar situation in Ciup v. Chevron U.S.A., Inc., that case does not answer the choice-of-law question the Court faces today. In that case, a plaintiff was injured at a gas station and sued Spilca, the operator and lessee of the gas station; Rio Grande Oil, the owner-lessor of the station; and Chevron U.S.A., who manufactured the gasoline sold at the Chevron-branded station.   See 1996-NMSC-062 ¶ 2. Chevron U.S.A. moved for summary judgment, asserting that although it allowed Spilca to use its logo and products, it did not exercise sufficient control to give rise to an agency relationship or vicarious liability.   See 1996-NMSC-062 ¶¶ 3, 4, 6.   The Supreme Court of New Mexico did not discuss its choice-of-law analysis, but applied New Mexico law in determining whether Spilca was Chevron U.S.A.'s agent.   See 1996-NMSC-062 ¶ 5.   In that case, however, Chevron U.S.A. "did not directly enter into any contract with Spilca."   1996-NMSC-062 ¶ 10.   Although there were contracts between Chevron U.S.A. and Rio Grande Oil, and contracts between Rio Grande Oil and

Spilca, there was not a contract between Chevron U.S.A. and Spilca governing their relationship. See 1996-NMSC-062 ¶¶ 9-10. Because there was not a franchise agreement or other contract governing their relationship, the question remains as to what New Mexico courts would do if faced with the question whether a franchisee who entered a franchise agreement with a franchisor is the franchisor's agent for purposes of vicarious liability.

For choice-of-law analysis, "New Mexico has traditionally followed the Restatement (First)." Ferrell v. Allstate Ins. Co., 2008-NMSC-042 ¶ 50, 144 N.M. 405, 188 P.3d 1156. New Mexico courts have "been willing to consider the Restatement (Second) approach" in certain circumstances, Ferrell v. Allstate Ins. Co., 2008-NMSC-042 ¶ 56 n.3, such as when determining what law to apply in multi-state class actions, Ferrell v. Allstate Ins. Co., 2008-NMSC-042 ¶ 56; forum non conveniens, Buckner v. Buckner, 1981-NMSC-007, 95 N.M. 337, 339, 622 P.2d 242, 244; and jurisdiction, Worland v. Worland, 89 N.M. 291, 293, 295, 551 P.2d 981, 983, 985 (1976). Although the Supreme Court of New Mexico "has not embraced the Restatement Second with respect to choice-of-law issues in either tort or contract," Estate of Gilmore, 1997-NMCA-103, 124 N.M. 119, 125, 946 P.2d 1130, 1136, New Mexico courts not rigidly applied the Restatement (First) of Conflict of Laws in certain areas, see City of Raton v. Ark. River Power Auth., 760 F. Supp. 2d 1132, 1150 (D.N.M. 2009)(Browning, J.). For example, in Estate of Gilmore, which was a tort case, the Honorable Harris Hartz, then New Mexico Court of Appeals Judge and now Circuit Judge for the United States Court of Appeals for the Tenth Circuit, explained:

> We perceive New Mexico conflict-of-law doctrine as reflecting a desire for the greater certainty presumably provided by more traditional approaches to conflict-of-laws problems, tempered by recognition that important policy considerations cannot be ignored. See [State Farm Mut. Ins. Co. v. Conyers, 109 N.M. 243,] 247, 784 P.2d [860,] 990 [(1989)]; [First National Bank v.] Benson, 89 N.M. [481,] 482-83, 553 P.2d [1288,] 1289-90 [(Ct. App. 1976)]. Therefore, we begin with a strong presumption in favor of application of the

place-of-the-wrong rule, but we will not close our eyes to compelling policy arguments for departure from the general rule in specific circumstances.

In Estate of Gilmore, 124 N.M. at 125, 946 P.2d at 1136.  Thus, New Mexico courts recognize that, under some circumstances, rigid adherence to the Restatement (First) of Conflict of Laws is not appropriate, and that other considerations, such as policy, might govern a choice-of-law analysis.  The Court anticipates that New Mexico courts thus would look to the Restatement (First) of Conflict of Laws absent compelling policy reasons to deviate from that approach.

In its contracts provisions, the Restatement (First) states: "Whether an agreement between two or more persons constitutes an authorization by one person that another may perform an act on his behalf is determined by the law of the place where the agreement is made."  Restatement (First) of Conflict of Laws § 343.  This rule seems to answer the question before the Court -- whether the franchise agreement authorized Barreras Enterprises to act on Denny's, Inc.'s behalf as Denny's, Inc.'s agent -- and contemplates following the contract choice-of-law analysis, which would likely lead to application of California Law.  The Restatement (First) also provides the following rule for vicarious liability: "When a person authorizes another to act for him in any state and the other does so act, whether he is liable for the tort of the other is determined by the law of the place of wrong."  Restatement (First) of Conflict of Laws § 387.  This rule does not seem to address the underlying question whether the franchise agreement authorized Barreras Enterprises to act on Denny's, Inc.'s behalf or the relationship between the parties, such as whether one is an agent or an independent contractor, but the third illustration in the comments contemplates this question:

A employs B to perform certain services for him in state X.  In the course of the work, B negligently injures C.  Suit is brought against A in state Y.  By the law of state X, B is an independent contractor whose employer is not liable for the harm caused in the particular situation.  By the law of state Y, B is the servant of A.  C

- 54 -

cannot recover from A.

Restatement (First) of Conflict of Laws § 387 cmt c.3.   Following this illustration, the law of the place of the wrong would apply, requiring application of New Mexico law.   Although sections 343 and 387 both seem to address the question before the Court, section 387 is more specific to the context of this case, which arises out of vicarious liability.   Section 343 would be helpful in analyzing whether Barreras Enterprises could bind Denny's, Inc. on a contract or whether, between themselves, they are in an agency relationship, but how they define their relationship does not necessarily preclude vicarious liability if Denny's, Inc. has sufficient control over Barreras Enterprises.   In other words, California law governs the issue "[w]hether [the] agreement between [Denny's, Inc.] and [Barreras Enterprises] constitutes an authorization by [Denny's, Inc.] that [Barreras Enterprises] may perform an act on [Denny's, Inc.'s] behalf," Restatement (First) of Conflict of Laws § 343; New Mexico law decides the separate question: "When [Denny's, Inc.] authorize[d] [Barreras Enterprises] to act for [Denny's, Inc.] in [New Mexico] and [Barreras Enterprises] does so act, whether [Denny's, Inc.] is liable for the tort of [Barreras Enterprises] is determined by [New Mexico law]," Restatement (First) of Conflict of Laws § 387.

Stated differently, the relationship between the franchisor and franchisee is only important to the extent that the relationship affects whether the franchisor owed the plaintiff a duty of care. In a negligence case, whether a person has a duty to protect another from harm depends on if the person has a special relationship with the other giving rise to a duty.   See Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶ 5.   "A duty flowing from actual or apparent agency arises with the existence of some degree of control by the principal over the conduct and activities of the agent. The degree of control giving rise to liability depends on the particular facts of each case."   Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶ 5 (internal citations omitted).   Determining whether the

parties have agreed that they are or are not in an agency relationship does not end the inquiry for the third party's tort claim against the parties: New Mexico courts look at the case's facts to determine the amount of control one party has over the other, and the information for this might come from a contract such as a franchise agreement, or from the parties' actual conduct.   Whether the parties identify the franchisee as an agent or an independent contractor would be one factor in determining whether the franchisor owes a duty to the injured plaintiff, but it is not the only consideration.   See Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶ 12 (discussing the affirmative steps Chevron U.S.A. took "with the intent to control the gas station's operation," even though there was no franchise agreement between Chevron U.S.A. and the gas station operator). The Supreme Court of New Mexico has indicated that how the parties to a contract define their relationship does not necessarily answer the question whether those parties are liable to a third party for a tort.   In Chevron Oil Co. v. Sutton, the Supreme Court of New Mexico analyzed the issue of vicarious liability for a franchisor, and said that "the manner in which the parties designate a relationship is not controlling, and if an act done by one person on behalf of another is in its essential nature one of agency, the one is the agent of the other, notwithstanding he is not so called."   85 N.M. at 681, 515 P.2d at 1285.   "Furthermore, it has long been the rule that a third person who deals with an agent is not bound by any secret or private instructions given to an agent by the principal."   85 N.M. at 681, 515 P.2d at 1285.

Looking to other jurisdictions, the Court finds only one instance where a court analyzes the choice-of-law problem in determining whether a franchisee is a franchisor's agent for purposes of vicarious liability.   In Greil v. Travelodge Intern., Inc., 541 N.E.2d 1288 (Ill. App. Ct. 1989), a paying guest at a Travelodge motel sued the franchisor Travelodge International, Inc. and the franchisee LaSalle Ohio Enterprises, Inc. for negligence in failing to provide proper security.   See

541 N.E.2d at 1289.   The trial court granted the franchisor's motion for summary judgment, because "it could find nothing in the pleadings or the franchise/license agreement that indicated International may have been responsible for the safety provisions alleged to have been breached." 541 N.E.2d at 1292.   The Illinois Appellate Court reversed, in part because it determined that the trial court applied the wrong law:

> Whether by inadvertence or deliberate design, International did not call the trial court's attention to significant provisions in the agreement which state that the agreement was 'entered into at El Cajon, California' and 'shall be governed by and construed in accordance with the laws of the State of California.'   While International did not deny that California law applied, it chose not to emphasize that point.   The application of California law, as required by the agreement, leads us to the conclusion that the trial court erred in granting summary judgment for International.

541 N.E.2d at 1267-68.   This analysis assumes that whether the franchisee is the franchisor's agent answers the vicarious liability question, thus causing the Illinois Appellate Court to look to the parties' choice-of-law provision in the franchise or license agreement.   One other case, Drexel v. Union Prescription Centers, Inc., 582 F.2d 781 (3d Cir. 1978), mentions that the agreement between the franchisor and franchisee included a choice-of-law provision, stating that "it could be argued" that the district court should have applied that provision and looked to Wisconsin law, the law chosen in the agreement, rather than Pennsylvania law, the law of the forum.   582 F.2d at 785. The Court of Appeals for the Third Circuit avoided analyzing which was correct, however, because it determined that "the laws of both states are in accord in their treatment of the matters before us."   582 F.2d at 785.   "Having therefore concluded that no conflict of law exists, we find no reason to diverge from the position of both parties and the district court that Pennsylvania law governs in this case."   582 F.2d at 785.

Greil v. Travelodge Intern., Inc. and Drexel v. Union Prescription Centers, Inc. are the only

opinions which the Court has found that mentions a choice-of-law provision in the franchise agreement, even though similar provisions likely appear in most franchise agreements.   The Court is hard pressed to believe that companies like McDonalds Corporation, Burger King Corporation, and Dunkin' Donuts, Inc. do not include choice-of-law provisions in their franchise agreements; yet courts that have reviewed those agreements do not discuss such provisions in determining which state's law to apply when evaluating the franchisor-franchisee relationship for purposes of vicarious liability.   See Wendy Hong Wu v. Dunkin' Donuts, Inc., 105 F. Supp. 2d 83 (E.D.N.Y. 2000); Hoffnagle v. McDonald's Corporation, 522 N.W.2d 808 (Iowa 1994); Folsom v. Burger King, 958 P.2d 301 (Wash. 1998).   It is possible that the litigants failed to raise the issue and the courts did not identify it on their own, but it is also likely that the courts did not separate the question of agency from the duty analysis in determining vicarious liability, thus applying whatever substantive law controlled the tort issues.

The Court concludes that New Mexico choice of law would dictate that the court should analyze the relationship between Denny's, Inc. and Barreras Enterprises under California law to determine what they intended between themselves.   The larger issue in this case is whether Denny's, Inc. owed Anderson a duty of care, a tort issue, which means that this is a torts issue to which New Mexico would apply the law of the place of the wrong -- in this case, requiring application of New Mexico substantive law to determine the vicarious-liability issue.

## II.   UNDER NEW MEXICO SUBSTANTIVE LAW, THE COURT FINDS A QUESTION OF FACT WHETHER DENNY'S, INC. HAD THE RIGHT TO CONTROL THE BARRERAS ENTERPRISES' DAY-TO-DAY OPERATIONS.

Although there are few Supreme Court of New Mexico cases[16] regarding a franchisor's

_____

[16] Federal courts must determine what a state's Supreme Court would do if confronted with the same issue.   See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).   In Stoner v. New York

vicarious liability, and none newer than 1996, the existing cases provide a picture of the spectrum

cases can run, from the franchisor exercising little to no control over the day-to-day activities, to

the franchisor exercising enough control to create a factual question that a court could submit to

the jury.   On the end demonstrating little control is <u>Ciup v. Chevron U.S.A., Inc.</u>, where the

plaintiff could point only to three indicators of control -- sending inspectors twice a year, posting a

toll-free number for customers to voice complaints, and restricting the sale of pornographic

materials -- none of which went beyond the franchisor's role in protecting its trademark.   <u>See</u>

1996-NMSC-062 ¶ 13.   On the other end of the spectrum is <u>Chevron Oil Co. v. Sutton</u>, which

suggests that when the franchisor exercises control in a number of ways -- such as requiring certain

----

<u>Life Insurance Co.</u>, 311 U.S. 464 (1940), the Supreme Court explained that, "in cases where
jurisdiction rests on diversity of citizenship, federal courts, under the doctrine of <u>Erie Railroad Co.
v. Tompkins</u> . . . must follow the decisions of intermediate state courts in the absence of
convincing evidence that the highest court of the state would decide differently."   311 U.S. at 467.
"In particular, this is true where the intermediate state court has determined the precise question in
issue in an earlier suit between the same parties, and the highest court of the state has refused
review."   <u>Stoner v. N.Y. Life Insurance Co.</u>, 311 U.S. at 467.   <u>See</u> <u>Adams-Arapahoe Joint Sch.
Dist. No. 28-J v. Cont'l Ins. Co.</u>, 891 F.2d 772, 774 (10th Cir. 1989)("With respect to issues which
the Colorado Supreme Court has not addressed, we may consider all available resources, including
Colorado appellate court decisions, other state and federal decisions, and the general trend of
authority, to determine how the Colorado Supreme Court would construe the law in this case.").
As the Tenth Circuit explained in <u>Wade v. Emcasco Insurance Co.</u>, 483 F.3d 657 (10th Cir. 2007):

> In cases arising under diversity jurisdiction, the federal court's task is not to reach
> its own judgment regarding the substance of the common law, but simply to
> ascertain and apply the state law. . . . The federal court must follow the most recent
> decisions of the state's highest court. . . . Where no controlling state decision exists,
> the federal court must attempt to predict what the state's highest court would
> do. . . .   In doing so, it may seek guidance from decisions rendered by lower courts
> in the relevant state . . . . appellate decisions in other states with similar legal
> principles . . . . district court decisions interpreting the law of the state in question, .
> . . and the general weight and trend of authority in the relevant area of law. . . .
> Ultimately, however, the Court's task is to predict what the state supreme court
> would do.   Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (citations omitted)(internal quotation marks omitted).

operating hours, maintaining the premises in good condition, wearing uniforms with the franchisor emblem, and promoting sale of franchisor's goods -- there may be a factual question regarding whether the franchisor exercised sufficient control leading to an actual agency relationship.   <u>See</u> 85 N.M. at 682, 515 P.2d at 1286.

A number of facts potentially demonstrate Denny's, Inc.'s control over the day-to-day operations of the franchisee restaurant: (i) Barreras Enterprises must pay Denny's, Inc. franchise fees and other consideration, measured by a percentage of weekly gross sales; (ii) Barreras Enterprises must send a cumulative cash register tape to show weekly sales; (iii) Barreras Enterprises must strictly adhere to the standards, policies, procedures, and requirements for the operation, maintenance or improvement of Denny's restaurants, using the Denny's System and Denny's Marks; (iv) Denny's, Inc. must approve restaurant site development, construction, and remodeling; (v) Denny's, Inc. can enter the premises to make modifications necessary to protect the Denny's marks and related proprietary rights; (vi) Barreras Enterprises must comply with Denny's operations manual, food service standards, restaurant maintenance and repair, hours of operation, personnel standards, inspections, and training; (vii) Denny's, Inc. requires certain standards for food quality, timing, and service; (viii) Barreras Enterprises and its managers must attend training to learn the Denny's System; (viii) Barreras Enterprises' personnel may attend refresher or additional training; (ix) Denny's, Inc. performs inspections for quality control, hazard analysis, and hospitality, including whether employees wash their hands before putting on a new pair of gloves; (x) Denny's, Inc. requires training on food handling; (xi) Denny's, Inc. must approve the vendors from whom Barreras Enterprises purchases food; (xii) Denny's, Inc. mandates a system for preparation of the food; (xiii) Denny's, Inc. may terminate the agreement if Barreras Enterprises fails to comply with the Denny's, Inc. requirements, including failing to

remodel; (xiii) upon terminating the agreement, Denny's, Inc. may purchase the franchisee restaurant at fair market value; (xiv) Denny's, Inc. requires Barreras Enterprises to obtain liability insurance; (xv) Denny's, Inc. requires that Barreras Enterprises' employees are neat, clean, and adequately trained and supervised, that they wear neat, clean, and uniform attire, and that they provide service to the public in a courteous, efficient, and skilled manner; and (xvi) Barreras Enterprises must operate twenty-four hours a day and seven days a week, or receive permission from Denny's, Inc. to deviate from that schedule.

If the amount of control a franchisor may have over a franchisee is seen as a spectrum, where one end shows a lack of control over the day-to-day operations, and the other end shows the right to control the day-to-day operations, determining where along the spectrum New Mexico would place this case, especially considering the age of the relevant Supreme Court of New Mexico cases, presents challenges.   That the Anderson Estate can point to a number of facts it alleges demonstrates Denny's, Inc.'s control over the day-to-day operations does not necessarily mean that Denny's, Inc. has such control -- all of the facts may delineate Denny's, Inc.'s protection of its trademark rather than its right to control the day-to-day operations.   Instead of resting solely on the spectrum demonstrated by Ciup v. Chevron U.S.A., Inc. and Chevron Oil Co. v. Sutton, the Court will do as the parties requested, which is to look at the cases the Supreme Court of New Mexico cited favorably in Ciup v. Chevron U.S.A., Inc., specifically those out-of-state cases it cited for the proposition that "protecting a trademark does not constitute sufficient control" over the franchisee's operation.   1996-NMSC-062 ¶ 13 (citing Wood v. Shell Oil Co., 495 So. 2d 1034 (Ala. 1986); Cislaw v. Southland Corp., 6 Cal. Rptr. 2d; Greil v. Travelodge Int'l, Inc., 541 N.E.2d 1288; Murphy v. Holiday Inns, Inc., 219 S.E.2d 874 (Va. 1975)).

In Wood v. Shell Oil Co., the Supreme Court of Alabama affirmed the trial court's decision

to grant summary judgment to the franchisor, because the plaintiff, who slipped and fell on ice or other substances while purchasing gasoline at the franchisee station, could not provide "a scintilla of evidence to make the existence of an agency relationship between Shell Oil [the franchisor] and Parker Shell [the franchisee] a jury question."   495 So. 2d at 1035.   Although the plaintiff could list over fourteen reasons from the franchise agreement and depositions in evidence to support his argument that Parker Shell was Shell Oil's agent, the Supreme Court of Alabama rejected them, stating that,

> [a]lthough the lease and the dealer agreement specify, in some detail, what Parker Shell must do in order to conform to the terms of these contracts, and gives Shell Oil a right to approve certain aspects of Parker' shell's operation, they do not determine how Parker Shell is to achieve compliance with these terms.

495 So. 2d at 1037 (emphasis in original).   In so holding, the Supreme Court of Alabama rejected many of the facts similar to what the Anderson Estate argues establish control, including: (i) requirements to keep the station open twenty-four hours each day; (ii) contract provisions that Shell Oil had to approve all alterations on the premises; (iii) requirements that the station had to conform to Shell Oil's standards and specifications regarding architectural design, style, color scheme, and layout; (iv) requirements of high standards for service, specifically that the mechanical work performed had to be done in a workmanlike manner using only first-class materials and parts; (v) requirements that Shell Oil reserved the right to offer supplemental training to the dealer's employees; (vi) requirements that the employees must wear clean uniforms of a type and style Shell Oil approved; (vii) requirements that Shell Oil had to approve all the signs and posters on the premises; (viii) requirements that Shell Oil adhere to an Appearance Guide for the station; (ix) requirements that the dealer notify Shell Oil of all occurrences of injury, death, or damage to persons within 24 hours; (x) contract provisions that Shell Oil retained the right to

inspect the dealer's premises, and the dealer's books and records, to ensure compliance with the agreement; and (xi) contract provisions that Shell Oil could terminate the agreement, at its option, for the dealer's failure to comply with the agreement.   See 495 So. 2d at 1036-37.   Also similar to this case, Shell Oil pointed to the following evidence from the lease agreement and dealer agreement to establish that it was not in an agency relationship with Parker Shell: (i) provisions that Shell Oil did not reserve any right to exercise control over the business or operations of Parker Shell and that the dealer was an independent businessman; (ii) Parker Shell employees received compensation and benefits exclusively from Parker Shell; and (iii) Parker Shell retained exclusive control to hire and fire employees.   This case demonstrates some of the activities a franchisor may do to protect its trademark without opening itself to vicarious liability.

In Cislaw v. Southland Corp., a California Court of Appeal affirmed the trial court's determination that the franchisee 7-Eleven store was not The Southland Corporation's agent for purposes of finding vicarious liability when a customer of the 7-Eleven store died after smoking a clove cigarette he purchased from the store.   6 Cal. Rptr. 2d at 387.   The California court examined the history of agency law in the state and concluded that "[t]he cases, taken as a whole, impliedly recognize that the franchisor's interest in the reputation of its entire system allows it to exercise certain controls over the enterprise without running the risk of transforming its independent contractor franchisee into an agent."   6 Cal. Rptr. 2d at 391.   The plaintiff argued that many provisions in the franchise agreement gave Southland Corp. control over the daily operations, such as provisions that required: (i) attendance at operations training programs; (ii) keeping the store and its surroundings clean and maintaining the equipment in good repair; (iii) carrying an inventory of the type, quality, quantity and variety consistent with the 7-Eleven image; (iv) operating the store from 7:00 a.m. to 11:00 p.m. 364 days a year; (v) making daily deposits of

receipts into a designated account; (vi) providing Southland Corp. with copies of purchase and sales records; (vii) making the books available for inspection during normal business hours; and (viii) paying a percentage fee based on receipts from sales less cost of goods sold.   See 6 Cal. Rptr. 2d at 392.   The California court held that these actions were insufficient to demonstrate control over the day-to-day operations, especially in light of the other evidence that the franchisee controlled decisions "relating to employment, inventory and day-to-day operations of the 7-Eleven store."   6 Cal. Rptr. 2d at 394.   Further, the California Court of Appeal analyzed whether the franchise agreement was terminable at will: concluding that it was not, it said that the plaintiff could not prove its agency theory of liability.   See 6 Cal. Rptr. 2d at 394.

The Supreme Court of New Mexico described the holding from Murphy v. Holiday Inns, Inc.: "[F]ranchisor's protection of the trademark does not create a principal-agent or master-servant relationship; use of [the] trademark was to benefit both parties, and franchisor lacked control over the motel's daily operations."   Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶ 13.   In Murphy v. Holiday Inns, Inc., the Supreme Court of Virginia affirmed the trial court's decision to grant Holiday Inns, Inc.'s motion for summary judgment where a guest at a Holiday Inn brand motel sued Holiday Inns for personal injuries sustained when she fell on an area of a walk where air conditioner water accumulated.   219 S.E.2d at 875.   The Supreme Court of Virginia noted that, even if the franchisor and franchisee disclaimed an agency relationship in a franchise agreement, a court must consider the agreement as a whole to determine the relationship of the parties.   See 219 S.E.2d at 876.   The franchise agreement in that case required: (i) that the licensee construct its motel according to plans, specifications, feasibility studies, and locations under the licensor's approval; (ii) that licensee pay a fee for the right to use the Holiday Inn marks; (iii) that Holiday Inns., Inc. would provide training for the licensee's manager, housekeeper, and

restaurant manager at the licensee's expense; and (iv) that the licensee conduct its business under the Holiday Inn system.   See 219 S.E.2d at 876-77.   In affirming the grant of summary judgment, the Supreme Court of Virginia said that, "from the face of the document, the purpose of those provisions was to achieve system-wide standardization of business identity, uniformity of commercial service, and optimum public good will, all for the benefit of both contracting parties." 219 S.E.2d at 878.

The Supreme Court of New Mexico cited Greil v. Travelodge Int'l, Inc. for the proposition that an actual agency exists only if the franchisor "imposed controls beyond those necessary to protect its trademark."   Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶ 13.   Greil v. Travelodge Int'l, Inc. demonstrates how a franchisor can step beyond the control necessary to protect its trademark.   The Appellate Court of Illinois listed several terms within franchise agreements that indicated control: (i) "that the facility be built and maintained according to specifications and requiring certain operational procedures"; (ii) "the requirement that the franchisee permit regular inspections by franchisor's inspectors to ensure compliance with procedures"; (iii) "terms providing that substantial violations of any of the covenants of the franchise agreement gives the franchisor the right to cancel the license"; (iv) minimum price fixing; (v) franchisor approval of all advertising; (vi) profit sharing; (vii) and book auditing.   541 N.E.2d at 1292-93 (citations omitted).   The plaintiff in Greil v. Travelodge Intern., Inc. was staying at a Travelodge brand hotel when a robber entered his room; in an attempt to escape, the plaintiff jumped from the second story room to the sidewalk.   See 541 N.E.2d at 1289.   He sued Travelodge International, Inc. for injuries he sustained, and after he learned of the franchise relationship between Travelodge International and LaSalle Ohio Enterprises, Inc., the franchisee, he amended his complaint and asserted that Travelodge International was vicariously liable for

LaSalle Enterprises' failure to provide proper security.   See 541 N.E.2d at 1289.   The Appellate Court of Illinois reversed the trial court's grant of summary judgment, in part because the trial court relied on the wrong state's substantive law, leading to an incorrect analysis whether the undisputed facts created a factual question on the franchisor's control over the day-to-day operations or responsibility for security.   See 541 N.E.2d at 1292.   Under the franchise agreement, Travelodge International had the right to supervise the motel operations, require LaSalle to send its management to a training program, and cancel the license if LaSalle Enterprises violated the agreement.   See 541 N.E.2d at 1291-92.   The agreement also stated that LaSalle Enterprises was to maintain the motel "in a clean, safe and orderly manner" and "maintain the highest standards of hospitality."   541 N.E.2d at 1291-92.   The Appellate Court of Illinois relied heavily on these last two provisions, stating that the circumstances allowing a criminal to break into a guest's room created "a disputed question of fact as to whether International, LaSalle, or both failed to provide plaintiff with 'clean, safe and orderly' accommodations and failed to maintain the 'highest standards of hospitality.'"   541 N.E.2d at 1293.   Further, Travelodge International had the right to inspect LaSalle's operation:

> Among the many items checked, found deficient, and called to LaSalle's attention for correction were matters involving the safety of guests.   We note from the record that lighting of the parking area, locks on the premises and latches and locks on windows were called to the attention of LaSalle for correction.   Whether the intrusion of the criminal into the room of the plaintiff, or other guests, might or could have been prevented creates a question of material fact.

541 N.E.2d at 1293.   Although the Illinois court discussed California substantive law as requiring that the franchisor be involved in the day-to-day operations, its analysis focused more on the specific involvement the franchisor had in providing security, through its requirement that the franchisee maintain "clean, safe and orderly" accommodations and the franchisor's right to inspect

the premises, including the safety of the rooms.   541 N.E.2d at 1293.

These cases, upon which the Supreme Court of New Mexico relied and cited favorably in Ciup v. Chevron U.S.A., Inc., demonstrate that there is not a consensus among even those few courts on how to characterize similar facts, as one court may interpret a fact as giving the franchisor control over daily operations, while another court may interpret that same fact as simply protecting a trademark.   This inconsistency is especially apparent in cases involving restaurant franchises.   For example, in Butler v. McDonald's Corp., 110 F. Supp. 2d 62 (D.R.I. 2000), the Honorable Judge Lagueux, United States District Judge for District of Rhode Island, observed that "courts have reached different conclusions" as to whether the following facts created an agency relationship between McDonald's Corporation and the franchisee restaurants:

> Plaintiff claims that . . . defendant maintains a right to control the operations and management of the franchise restaurant through operational and training manuals, a franchise license agreement, and an operator's lease and license agreement. Additionally, plaintiff claims defendant exercises a right to control through defendant's requirement that the restaurant conform to the McDonald's "comprehensive" system, the frequent and detailed inspections of the premises and its operations, the taking of profits, and the right of defendant to terminate the agreement for material breach.

110 F. Supp. 2d at 67.   Judge Lagueux noted that, in Hoffnagle v. McDonald's Corp., 522 N.W.2d 808 (Iowa 1994), the Supreme Court of Iowa characterized these facts as assuring the uniformity and standardization of the products and services that the franchisee restaurant offered, and granted summary judgment to the franchisor.   See Butler v. McDonald's Corp., 110 F. Supp. 2d at 67. On the other hand, the Court of Appeals of Oregon in Miller v. McDonald's Corp., 945 P.2d 1107 (Or. 1997)(Warren, P.J., with Edmonds, J., and Armstrong, J.), reached the opposite conclusion. That court "noted that the franchise agreement 'did not simply set standards that the franchisee had to meet.   Rather, it required the franchisee to use the precise methods that the franchisor

- 67 -

established . . . .'"   Butler v. McDonald's Corp., 110 F. Supp. 2d at 67 (quoting Miller v.

McDonald's Corp., 945 P.2d at 1111).   The Court of Appeals of Oregon found that the franchisor

could enforce its control through regular inspections and the ability to cancel the franchise

agreement, leading that court to deny the franchisor's motion for summary judgment.   See Butler

v. McDonald's Corp., 110 F. Supp. 2d at 67.   Faced with two competing interpretations of the

same facts, Judge Lagueux concluded that the reasoning in Miller v. McDonald's Corp. was more

persuasive, and likewise denied summary judgment, because "a reasonable jury could find that an

agency relationship exists and that defendant can be held vicariously liable."   Butler v.

McDonald's Corp., 110 F. Supp. 2d at 67-68.

    With the limited, and aged, New Mexico case law, along with the discrepancies between

how courts view similar facts, it is difficult to know exactly how a New Mexico court would

analyze the facts in this case.   As a federal court sitting in diversity, the Court's role is, however,

to determine what the Supreme Court of New Mexico would do in this situation.   See Campos v.

Las Cruces Nursing Center, 828 F. Supp. 2d 1256, 1275-76 (D.N.M. 2011)(Browning, J.).   The

Court recognizes that several out-of-state cases the Supreme Court of New Mexico cited favorably

in Ciup v. Chevron U.S.A., Inc. hold that similar facts on which the Anderson Estate relies do not

amount to control over the day-to-day operations, such as the requiring the franchisee to pay a

percentage of weekly gross sales, see Cislaw v. Southland Corp., 6 Cal. Rptr. 2d at 392; requiring

Denny's, Inc.'s approval over site development, construction, and remodeling, see Wood v. Shell

Oil Co., 495 So. 2d at 1037; requiring franchisee managers to attend training, see Wood v. Shell

Oil Co., 495 So. 2d at 1037; Murphy v. Holiday Inns, Inc., 219 S.E.2d at 877-78; stating the

general standards for franchisee employees and how they are to provide service, see Wood v. Shell

Oil Co., 495 So. 2d at 1037; allowing Denny's, Inc. to conduct inspections at the franchisee

restaurants, see Wood v. Shell Oil Co., 495 So. 2d at 1037; Denny's, Inc.'s ability to terminate the franchise agreement if it finds the franchisee failed to comply with certain requirements, see Wood v. Shell Oil Co., 495 So. 2d at 1037; and the requirements on hours of operation, see Wood v. Shell Oil Co., 495 So. 2d at 1037; Cislaw v. Southland Corp., 6 Cal. Rptr. 2d at 392.   On the other hand, the Supreme Court of New Mexico also cited Greil v. Travelodge Intern., Inc., which indicated that several of those same facts supported a finding that the franchisor controlled the day-to-day operations, including terms requiring that Denny's, Inc. approve restaurant site development, construction, and remodeling; permitting Denny's, Inc. to regularly inspect the franchisee restaurant; and Denny's, Inc.'s right to terminate the agreement.   See 541 N.E.2d at 1292-93. Furthermore, although the case dates back to 1973, and the Court must be careful about its use of this case given Justice Minzner's narrow reading of it in Ciup v. Chevron U.S.A., Inc., the Supreme Court of New Mexico, in an opinion written by Justice Chief Justice McManus in which Justices Oman, Montoya, and Martinez concurred, previously held in Chevron Oil Co. v. Sutton that the facts, even if undisputed, can lead to a factual question for the jury if they can be understood as giving the franchisor sufficient control over the franchisee.   See 85 N.M. at 682, 515 P.2d at 1286 ("In the present case, there is a substantial dispute as to a material fact, and this should foreclose summary judgment.   The fact in dispute is whether or not Chevron exercised such control over Sharp as to bring the doctrine of respondeat superior into play.").   The Supreme Court of New Mexico analyzed similar aspects of control as this case, including that the franchise agreement requires certain operating hours, states standards for keeping the premises clean and orderly, and requires employees wear uniforms with the franchisor emblem.   See 85 N.M. at 682, 515 P.2d at 1286.   The Court recognizes that Justice Minzner, in which Justices Ransom and Scott joined, in Ciup v. Chevron U.S.A., Inc., read Chevron Oil Co. v. Sutton very narrowly, seemingly

interpreting the case as an apparent agency case only and not a case also addressing actual authority.   See Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶¶ 15-18.   Justice Minzner in Ciup v. Chevron U.S.A., Inc. also emphasized that Chevron Oil owned the gas station in Chevron Oil Co. v. Sutton, another fact which limited its persuasiveness.   See Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶ 16.   The Court thinks that Justice Minzner's reading of Chevron Oil Co. v. Sutton is more limited than necessary, because Chevron Oil Co. v. Sutton reversed the grant of summary judgment on two theories -- the plaintiff raised material fact issues sufficient to submit to the jury the questions of actual authority and apparent authority.   See Chevron Oil Co. v. Sutton, 85 N.M. at 682, 515 P.2d at 1286.   While the Court disagrees with Justice Minzner's limited reading of Chevron Oil Co. v. Sutton, it recognizes that it is nonetheless bound by the most recent Supreme Court of New Mexico decisions in making its Erie determination, including its reading of Chevron Oil Co. v. Sutton.   See Campos v. Las Cruces Nursing Center, 828 F. Supp. 2d 1256, 1275-76 (D.N.M. 2011)(Browning, J.)(citing Wade v. EMCASCO Insurance Co., 483 F.3d 657, 665-66 (10th Cir.2007).   In other words, even if the Court thinks Justice Minzner incorrectly read Chevron Oil Co. v. Sutton, the Court is not free to treat Chevron Oil Co. v. Sutton in any other way than Justice Minzner did.   The Court thus recognizes that it should not view Chevron Oil Co. v. Sutton with the same authoritativeness as Ciup v. Chevron U.S.A., Inc.   On the other hand, the Court does not think that Chevron Oil Co. v. Sutton is of no value at all in having to decide what the Supreme Court of New Mexico would do in this case.   Chevron Oil Co. v. Sutton has not been overruled and remains good law.   Ciup v. Chevron U.S.A., Inc. has few facts on par with this case, and the facts in Chevron Oil Co. v. Sutton are much closer to those here.

It seems the best way to treat Chevron Oil Co. v. Sutton is to assume that Ciup v. Chevron U.S.A., Inc. is the only New Mexico case on franchisor liability, and basically ignore Chevron Oil

Co. v. Sutton as a New Mexico case.   On the other hand, even if Chevron Oil Co. v. Sutton were

treated as another jurisdiction's case, it would have some value, because the Supreme Court of

New Mexico relied heavily on cases from other jurisdictions in Ciup v. Chevron U.S.A., Inc.

Accordingly, so long as there is other support for concluding that the Supreme Court of New

Mexico, if making the decision that is before the Court today, would find Denny's, Inc.'s control

over Barreras Enterprises a question of fact for the jury, the Court will include Chevron Oil Co. v.

Sutton as part of the basis for making its determination, similar to the Court's ability to rely on

out-of-jurisdiction cases if it determines that the Supreme Court of New Mexico would do the

same.   These franchise cases are on a spectrum, and Chevron Oil Co. v. Sutton is another case on

the spectrum that would inform the Supreme Court of New Mexico's analysis and should inform

this Court's analysis.

Looking more specifically to the guidance of Ciup v. Chevron U.S.A., Inc., the Court notes

that Chevron U.S.A. did not have a franchise agreement with Spilca, the gas station operator, and

that factual difference from the current case is important: the franchise agreement here gives

Denny's, Inc. much more opportunity to be involved in Barreras Enterprises' restaurant

operations.   Denny's, Inc.'s control and involvement in Barreras Enterprises' restaurant is similar

to the relationship between Rio Grande Oil, the owner-lessor of the station and distributor of

Chevron gasoline, and Spilca, the gas station operator and lessee: the Supreme Court of New

Mexico was not asked to analyze that relationship, because the plaintiffs in that case

> conceded that it was Rio Grande who controlled the operation of Spilca's gas
> station.   Rio Grande visited the gas station weekly, controlled the price at which
> the gas was sold, required Spilca to maintain minimum hours of operation, handled
> all financial transactions, and deposited the sales proceeds into a bank account in its
> own name.

Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062 ¶ 14.   Similarly, Denny's, Inc. has the right to

regularly inspect Barreras Enterprises' restaurant and require certain hours of operation.

The Court recognizes that many of the facts that the Anderson Estate has identified can be understood as simply protecting Denny's, Inc.'s trademark, and while it might agree with that characterization generally, the Court's role is not to decide what it determines to be the preferable interpretation, but to decide how the Supreme Court of New Mexico would likely decide the issue. The parties have not argued that ambiguities in the contract lead to disputed material facts, but they disagree whether the facts support a finding that Denny's, Inc. did not have the right to control the day-to-day operations of the Barreras Enterprises' restaurant. The Court concludes that the Supreme Court of New Mexico would not grant summary judgment, but would view as a disputed fact whether Denny's, Inc. has control over the day-to-day operations of Barreras Enterprises' restaurant.

The Supreme Court of New Mexico would no doubt, as it did in <u>Ciup v. Chevron U.S.A., Inc.</u>, look at cases on a spectrum, and <u>Chevron Oil Co. v. Sutton</u> is a case on the spectrum that may be relevant to analyze, especially to the Supreme Court of New Mexico. In denying summary judgment, the Court does not conclude that Barreras Enterprises is Denny's, Inc.'s agent. What the Anderson Estate has accomplished is to create a jury question on the issue of Denny's, Inc.'s right of control over Barreras Enterprises. <u>See Ciup v. Chevron U.S.A., Inc.</u>, 1996-NMSC-062 ¶ 14 (stating that the plaintiff did not prove that the defendant had any control over the gas station's daily operation, and that the evidence "does not create a jury question on the issue of apparent agency or right of control").

While most cases discuss whether the franchisor has control or the right to control the day-to-day operations of the franchisee, it is difficult to understand what exactly is meant by that statement. The Supreme Court of New Mexico stated it slightly differently in 1964, albeit using

the terms "employer," "employee," and "independent contractor" rather than terms of agency, but

the context involved similar questions of the relationship between a franchisee and franchisor:

> Where the employee [franchisee] is subject only to the control or direction of the
> employer [franchisor] as to the result to be procured, he is an independent
> contractor; if he is subject to the control of the employer as to the means to be used
> in reaching that result, he is an employee [agent].

Shaver v. Bell, 74 N.M. at 705, 397 P.2d at 727.   Other courts have stated it similarly, recognizing

that

> [t]o protect its trademark, a franchisor 'must retain sufficient control over the
> licensees' dealings in the end product to insure that they will apply the mark to
> either the same product or to one of substantially the same quality with which the
> public in the past has associated the product.   Conversely, the vicarious liability
> 'right to control' test focuses on a franchisor's control over a franchisee's
> performance of its day-to-day operations.

Rainey v. Langen, 998 A.2d 342, 349 (Me. 2010).   This standard, too, suffers from being difficult

to understand and apply, because it is not clear when a franchisor is controlling the method or

when it is controlling the end result.   This case requires this difficult analysis: Denny's, Inc.,

through its inspections, has instructed Barreras Enterprises to change how it operates its restaurant,

noting things such as how employees wash their hands and whether the freezer was the appropriate

temperature.   In one sense, these facts protect the Denny's, Inc. brand, because Denny's, Inc. is

interested in the quality of the final product, but in another sense, Denny's, Inc. is controlling the

methods by which Barreras Enterprises creates the product.   It may be difficult for a restaurant

franchise to not get involved in the day-to-day operations and still ensure uniformity in the final

product, but that is a critique of the current framework and application of the rules in New Mexico,

something the Court is not free to change.   In the end, the Court's view is that the traditional

control test and instrumentality test are largely intellectually bankrupt.   The courts probably

should have bright-line rules: either all franchisors should be vicariously liable or none should.

Either rule is defensible, and would produce certainty to the franchise industry and to the insurance industry that insures the participants.   The test that most jurisdictions are employing, however, are so malleable and manipulable that they create confusion, litigation, and uncertainty, and, worse, any result from the tests looks result oriented, either pro-plaintiff or pro-industry, thus undermining the integrity of the court process.   In the end, it would be best to just pick a rule for franchisors, and let indemnification clauses and/or insurance determine who will pay any judgment.   In any case, the franchisors can largely avoid liability and attorney's fees with these devices, by insisting that the franchisees secure insurance policies with the franchisor as an additional insured or through hold-harmless previsions.

The Court concludes that the Supreme Court of New Mexico, if confronted with the facts of this case, would not decide as a matter of law there is no control, as it did on the unusual facts under Ciup v. Chevron U.S.A., Inc., but would find itself back to where it was in Chevron Oil Co. v. Sutton, on facts more similar to those here.   Even if Chevron Oil Co. v. Sutton is merely an apparent authority case, it gives the Court more guidance on what the Supreme Court of New Mexico would do on these facts than Ciup v. Chevron U.S.A., Inc. on its unusual facts. Accordingly, the Court concludes that the Supreme Court of New Mexico would deny summary judgment and submit the issue of control to the jury.

III.   **THE COURT CANNOT PROPERLY ADOPT A MODIFIED RULE FOR FRANCHISOR VICARIOUS LIABILITY, BECAUSE THERE IS A BINDING SUPREME COURT OF NEW MEXICO CASE SETTING FORTH THE TRADITIONAL RULE.**

Denny's, Inc. argues that the current trend in franchisor vicarious liability suits is toward an instrumentality rule, which would expose the franchisor to vicarious liability only if "the franchisor had control or right of control over the daily operation of the specific aspect of the

franchisee's business that is alleged to have caused the harm."   Rainey v. Langen, 998 A.2d 342,

348 (Me. 2010).   This modified rule is a response to the difficult line franchisors must walk

between their affirmative duties to protect their trademarks under the Lanham Act, and the risk of

opening themselves up to vicarious liability for franchisees' acts.   See Rainey v. Langen, 998

A.2d at 348.   "As one commenter has noted, broadly extending vicarious liability could

improperly penalize a franchisor for exercising the degree of control necessary to protect the

integrity of its trademark."   Rainey v. Langen, 998 A.2d at 348 (citing Michael R. Flynn, Note,

The Law of Franchisor Liability: A Critique, 1993 Colum. Bus. L. Rev. 89, 99 (1993)).   When

faced with the opportunity to adopt the modified approach, the Supreme Judicial Court of Maine

said that the traditional right-to-control approach

> recognizes that, while the vicarious liability and Lanham Act analysis involve an
> element of "control," the inquiries are distinct.   To protect its trademark, a
> franchisor 'must retain sufficient control over the licensees' dealings in the end
> product to insure that they will apply the mark to either the same product or to one
> of substantially the same quality with which the public in the past has associated the
> product.   Conversely, the vicarious liability 'right to control' test focuses on a
> franchisor's control over a franchisee's performance of its day-to-day operations.

Rainey v. Langen, 998 A.2d at 349 (internal citations omitted)(emphasis in original).   The

Supreme Judicial Court of Maine declined the opportunity to adopt the modified approach, finding

that the traditional test "allows a franchisor to regulate the uniformity and the standardization of

products and services without risking the imposition of vicarious liability."   998 A.2d at 349.

The traditional test allows the franchisor to control the day-to-day activities only to the extent

necessary to protect its trademark; anything beyond that and the franchisor may be vicariously

liable for the franchisee's acts, while the modified test blends vicarious liability with direct

liability.   See 998 A.2d at 349.   It is an undisputed fact that Denny's, Inc. did not control or have

the right to control security at the Barreras Enterprises' restaurant, and adopting this test would

likely require granting the MSJ.

It would not be proper for the Court to adopt this instrumentality test when the latest Supreme Court of New Mexico case states and applies a traditional vicarious liability test, and does not indicate that it would adopt the modified test. See Ciup v. Chevron U.S.A., Inc., 1996-NMSC-062. Federal courts sitting in diversity must determine what a state's highest court would do if confronted with the same issue, and must follow the most recent decisions of the state's highest court. See Campos v. Las Cruces Nursing Center, 828 F. Supp. 2d at 1275-76 (Browning, J.). If the Supreme Court of New Mexico did anything with this suggested approach, it would likely apply it to require more from the franchisors and not less. For example, in Greil v. Travelodge Intern., Inc., the Appellate Court of Illinois, in interpreting California law, set out the traditional rule, but then when it came to the analysis, concluded that the franchisor was involved in the day-to-day operation of the motel based on the franchisor's involvement in the security at the franchisee. See 541 N.E.2d at 1293 (discussing that, during inspections, the franchisor called to the franchisee's attention "matters involving the safety of guests"). The Court thinks that, if New Mexico were to do adopt the instrumentality test, it would adopt it in a similar fashion, as an alternative test; if the plaintiff could not meet the traditional control test, it might still secure vicarious liability if the franchisor had retained control over security and the case involved security. Hence, even if the Supreme Court of New Mexico concluded that the franchisor was not involved in the day-to-day operations, vicarious liability might still be available if the franchisor was involved in the specific instrumentality. On the other hand, the Supreme Court of New Mexico would not require, for there to be vicarious liability, that the franchisor have the to control that instrumentality if it otherwise has control over the day-to-day operations.

This analysis may seem like an unfair outcome to Denny's, Inc., which attempted to protect

itself from vicarious liability through provisions in the Franchise Agreement limiting its relationship to Barreras Enterprises: several times, they defined the relationship as one of an independent contractor status rather than an agency status.  Denny's, Inc. as a franchisor may justifiably ask what it can do to protect itself from vicarious liability for its many franchisees: the Court notes that, although Denny's, Inc. can neither change the tort law, nor demand that the law treat its agreements a certain way -- the way it wants -- it is not without some protection.   As it has done in this Franchise Agreement, Denny's, Inc. can require the franchisee restaurants to obtain insurance and to indemnify Denny's, Inc. for any loss, costs, expenses, damages, or liabilities resulting from the franchisee's operation.

This may not be entirely satisfactory to franchisors like Denny's, Inc., but the Court is not free to decide this issue on a blank slate -- it must apply New Mexico's substantive law, and concludes that the Supreme Court of New Mexico would find a question of fact to submit to the jury regarding whether Denny's, Inc. controlled or had the right to control the day-to-day operations of Barreras Enterprises' restaurant.   The Court will thus deny the MSJ.

## IV.    **THE COURT WILL DENY THE MOTION TO CONTINUE**.

The Anderson Estate moved the Court to continue the hearing on the MSJ, which the Court denied at the February 8, 2013 hearing.   Since that time, however, the Anderson Estate has had the opportunity to conduct additional discovery and submit evidence to the Court, and the Court has also heard additional arguments on the MSJ on November 5, 2013.   So while the Court did not continue the February 8, 2013 hearing, it gave the Anderson Estate an opportunity to do discovery and then come back another date for more oral argument.   The Court maintains its ruling on the Motion to Continue, because the Anderson Estate did not follow proper procedure to request the Court to continue the hearing: the Anderson Estate should have specified that it needed additional

discovery by attaching a sworn affidavit pursuant to rule 56(d) of the Federal Rules of Civil Procedure, which would have allowed the Court to defer ruling on the MSJ until discovery was complete.   The Court recognizes, however, that the Anderson Estate has benefited from the additional opportunities to submit evidence and argue the MSJ.   Not only has the Anderson Estate not been prejudiced by the Court's refusal to continue the February 8, 2013 hearing, but the Anderson Estate has benefited from the denial, in that it gave all parties two opportunities to argue the issues, choice of law, and vicarious liability.

**IT IS ORDERED** that (i) the Motion for Summary Judgment of Denny's, Inc., filed October 26, 2012 (Doc. 40), is denied; and (ii) the Motion to Continue Defendant Denny's Inc. Summary Judgement[sic] Hearing, filed January 29, 2013 (Doc. 60), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Shannon Robinson
Albuquerque, New Mexico

     *Attorney for the Plaintiff*

Scott P. Hatcher
Hatcher & Tebo, P.A.
Santa Fe, New Mexico

     *Attorneys for the Defendant and Cross Claimant Denny's, Inc.*

Paul Maestas
Maestas & Suggett, P.C.
Albuquerque, New Mexico

*Attorneys for the Defendants and Cross Defendants Barreras Enterprises, Inc.,*
*Frank H. Barreras, June R. Barreras, and Judith A. Barreras*